# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Mario Pillco Morocho, Abdoulaye Fall, Darlin Guillermo, Juan Carlos Illicachi Shigla, Diego Galindo, Segundo Armijos, Diego Armando Gullán Tixi, Miguel Lucas Ixcuna Yax, Lloyd Wafula, Conroy Desmond Lewis, Carlos Menjivar Rojas, Nuelson Gomes, Flavio Andrade Prado Junior, Janito De Cavalho, Joao Fernandez, and Marco Battistotti, | ) ) ) ) ) ) ) ) | Case No. _____ |
| | ) | **COMPLAINT AND** |
| Plaintiffs, | ) ) | **DEMAND FOR JURY TRIAL** |
| v. | ) ) | |
| | ) | |
| Bristol County Sheriff's Office, Sheriff Thomas Hodgson, in his individual capacity, Superintendent Steven Souza, in his individual capacity, Todd Lyons, in his individual capacity, the United States Department of Homeland Security, Immigration and Customs Enforcement, the United States of America, and Officers Doe #1-26 in their individual capacities. | ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT AND REQUEST FOR RELIEF

**INTRODUCTION**

The COVID-19 pandemic has devastated the planet. As of the date of this filing 6.2 million people have died from the illness worldwide including approximately 20,000 people in the Commonwealth of Massachusetts. While the disease is deadly, there are safety precautions that can be taken and have proved effective. It has long been known, for example, that confinement in congregate settings dramatically heightens the risk of contracting this serious, life-threatening infection. However, despite this knowledge, and despite desperate pleas from immigrants detained at the Bristol County House of Correction (BCHOC) in North Dartmouth, Massachusetts, Defendants continued to detain people in close quarters in congregate settings. They refused to take meaningful steps to ensure the safety of those detained, to engage in testing protocols, and to release those detained, including Plaintiffs from the facility.

The refusal to take appropriate safety measures had two consequences. First, it caused severe harm to Plaintiffs. Plaintiffs suffered emotionally and physically from their prolonged confinement and the risk such confinement subjected them to. Those effects persist to this day with Plaintiffs continuing to experience both mental and physical repercussions of their time in detention.

Second, it caused people inside BCHOC to turn to the courts for relief. The actions of Defendants led this Court to find a likelihood of success on the merits of Plaintiffs' constitutional claims concerning the unconstitutional risk of harm they faced at BCHOC. This finding lead to a release order that removed dozens of people from the crowded BCHOC facility. But, by the time were forced to Defendants release people under court order, significant damage had already been done. Plaintiffs were held in a packed, unhygienic, congregate facility for months. They were not given the opportunity to even test for COVID-19 without court order.

In addition to the unconstitutionally dangerous conditions suffered by Plaintiffs during their detention at BCHOC, numerous Plaintiffs were physically attacked by some Defendants. On May 1, 2020, Plaintiffs and other detainees complained and heightened their expressions of concern about the sanitary conditions and COVID-19 testing protocols at BCHOC. In response, Defendant guards used excessive force against them. They repeatedly sprayed Plaintiffs with pepper spray, punched and kicked Plaintiffs while restrained, and then placed numerous Plaintiffs in solitary confinement for weeks without any medical treatment, despite serious injuries. All Plaintiffs who suffered the brunt of this attack sustained a series of serious of physical injuries and psychological effects, including severe chest pains, limited mobility, and extensive anxiety and depression which has seriously affected their lives and livelihoods.

That Defendants acted with wanton disregard for the safety of those in their care and custody is uncontroversial. There is uniform agreement that Defendants committed serious violations that put peoples' lives in jeopardy. Judge Young, of this Court, granted a preliminary injunction against Defendants forcing the release of dozens of those detained;[1] the Massachusetts Attorney General's Office investigated the attack on May 1st at BCHOC and found widespread constitutional violations;[2] and the agency Defendants themselves elected to shutter the facility after examining this Court's findings, the Attorney General's report, and numerous calls from elected officials to close BCHOC.[3]  The releases and additional measures forced by this Court provided substantive prospective relief for many people in BCHOC, but none of these efforts compensated people for the widely acknowledged harm they suffered at the hands of Defendants.

---

[1] *Savino v. Souza*, 459 F. Supp. 3d 317, 320 (D. Mass. 2020).
[2] OFFICE OF THE MASSACHUSETTS ATTORNEY GENERAL CIVIL RIGHTS DIVISION, *Investigation into the Events of May 1, 2020 at the C. Carlos Carrieiro Immigration Detention Center, Unit B, Bristol County Sheriff's Office* (Dec. 15, 2020)
[3] Alejandro N. Mayorkas, DEPARTMENT OF HOMELAND SECURITY, *A First Step to Address the Conditions in Detention Facilities* (May 20, 2021) https://www.bostonherald.com/wp-content/uploads/2021/05/First-Step-to-Address-the-Condition-in-Detention-Facilities.pdf

This complaint now seeks that compensation.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff's claims arise under the United States Constitution, the Federal Torts Claims Act, 28 U.S.C. § 1346, the Americans with Disabilities Act, 42 U.S.C. §12101, and the Rehabilitation Act, 29 U.S.C. § 794(a).

2. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because the incidents giving rise to this action occurred in this district.

## **PARTIES**

### *Plaintiffs*

3. Plaintiffs are a group of people who were detained at BCHOC during the height of the COVI-19 pandemic and during the events of May 1, 2020.

4. Plaintiff Abdoulaye Fall is a thirty-seven-year-old father and husband who was detained in the BCHOC from May 2019 to May 2020 and currently lives in his home country of Senegal with his wife and children.

5. Plaintiff Darlin Guillermo is originally from the Dominican Republic and was detained at BCHOC from January 22, 2020, until he was deported back to his home country on December 1, 2020.

6. Plaintiff Diego Galindo is originally from Honduras and was detained at BCHOC from August 2019 until May 2020.

7.  Plaintiff Juan Carlos Illicachi Shigla is originally from Ecuador and was detained at BCHOC from January 2020 until he was deported on June 9, 2020.

8.  Plaintiff Segundo Armijos is originally from Ecuador and was detained at BCHOC from January 8, 2020, until he was deported on September 5, 2020.

9.  Plaintiff Diego Armando Gullán Tixi is originally from Ecuador and member of the indigenous Quichua de Chimboraso people. He was initially detained at BCHOC starting on January 7, 2020.

10. Plaintiff Miguel Lucas Ixcuna Yax is an asylum-seeker originally from Guatemala and was originally detained at BCHOC starting on March 3, 2020.

11. Lloyd Wafula is an asylum-seeker originally from Kenya and has been detained at BCHOC starting on August 2, 2019.

12. Conroy Desmond Lewis is a lawful permanent resident of the United States who is originally from Jamaica and was detained beginning in August 2019.

13. Carlos Menjivar Rojas is a United States citizen and was a United States citizen throughout his confinement at BCHOC. He was detained at BCHOC from July 2019 until July 14, 2020, when he was anticipated for removal to El Salvador.

14. Mario Pillco Morocho is originally from Ecuador and was detained at BCHOC from December 6, 2019 through November 15, 2020.

15. Nuelson Gomes is a lawful permanent resident and was born in Brazil but entered the US when he was 19 years old and worked as a sanitation truck driver. He is the father of three U.S. citizen children with his wife who is also a lawful permanent resident. He was detained at BCHOC starting on October 24, 2019.

16. Aires Da Graca is a 44 year old lawful permanent resident and was brought to the United States by his parents at age 13. He has lived in the United States for over 30 years and has no connection with his birth country of Cabo Verde in Africa. He has three U.S. citizen children. He was detained at BCHOC beginning on September 16, 2019.

17. Janito De Cavalho is a lawful permanent resident who has been began his detention in BHOC on November 4, 2019.

18. Flavio Andrade Prado Junior is from Brazil, and he was detained by ICE in BCHOC from April 2019 to December 2020.

19. Joao Fernandez was born in Cape Verde and entered the United States as a lawful permanent resident when he was eight years old. He has been detained in BCHOC starting on November 8, 2019.

20. Plaintiff Mario Battistotti was detained at BCHOC from March 5, 2020 until September 11,2020.

### *Defendants*

21. Defendant United States of America manages the Department of Homeland Security (DHS) and subsequently the United States Immigration and Customs Enforcement (ICE).

22. Defendant Department of Homeland Security (DHS) is the federal executive department responsible for immigration processing, which involves overseeing Immigration and Customs Enforcement (ICE)'s custody of individuals in immigration detention and processing for deportation.

23. Defendant Immigration and Customs Enforcement (ICE) retains custody of individuals who are apprehended for immigration purposes and is responsible for the care of these

individuals while they are awaiting their immigration proceedings. ICE contracted with the Bristol County Sherriff's Office (BCSO) to, among other things, detain immigrants in Bristol County House of Corrections (BCHOC).

24. Defendant Bristol County Sheriff's Office (BCSO) opted to participate in federal immigration enforcement through an intergovernmental services agreement (IGSA) with ICE and provide detention beds at BCHOC for people in ICE custody. As part of the IGSA, BCSO was required to provide services such as bed space, medical care, facility inspections, transportations, and the fixed per-detainee reimbursement rate paid to the facility by ICE.

25. Defendant Todd Lyons is named in his official and individual capacity as the acting Boston Field Office Director for U.S. Immigration and Customs Enforcement. He has responsibility for and authority over the detention and removal of noncitizens within the Boston Region, which includes Connecticut, Main Massachusetts, New Hampshire, Rhode Island, and Vermont.

26. Defendant Thomas M. Hodgson is named in his official and individual capacity and has served as the Bristol County Sheriff since 1997 and was last elected in 2016. In this role, he maintained supervision and control over Bristol County Immigration Detention Facilities including BCHOC.

27. Defendant Steven J. Souza is named in his official and individual capacity. He was the superintendent of BCHOC and was responsible for the safety and security of the detention center, supervised personnel, and managed detention operations.

28. Defendant Doe #1 is a Sherriff's Response Team ("SRT") officer on shift on or about May 1, 2020, who deployed pepper spray at numerous Plaintiffs. The identity of Doe #1 is currently unknown to Plaintiffs.

29. Defendant Doe #2 is an SRT Bravo Leader on May 1, 2020, who administered a flash bang grenade with gas into the housing unit after reentering into BCHOC with the SRT officers. The identity of Doe #2 is currently unknown to Plaintiffs.

30. Defendant Does #3-24 are BCSO officers working on or around May 1, 2020 who were involved in the events at Unit B. The identity of Does #3-24 are currently unknown to Plaintiffs.

## FACTUAL ALLEGATIONS

### Plaintiffs are Detained in the Bristol County House of Corrections

31. The Bristol County Sheriff's Office operated large detention complex in North Dartmouth Massachusetts, which included the Bristol County Jail and House of Correction (BHOC).

32. This detention complex held, in its various units, people detained for civil immigration violations as well as people arrested for criminal violations.

33. The BHCOC was comprised of several housing units, including three special management units where detainees were segregated and isolated from the general population for administrative, disciplinary, or protective reasons.

34. At the times relevant for this complaint, immigration detainees were held in Unit A, Unit B, and Unit 2 East.

Plaintiff Fall

35. Mr. Fall was transferred from the John M. Moran Medium Security facility in Cranston, Rhode Island to Bristol County House of Corrections (BCHOC) on or around May 14, 2019.

36. Mr. Fall was detained by ICE at the Bristol County House of Corrections (BCHOC) from May 2019 until the end of May 2020.

37. Mr. Fall arrived at BCHOC with tuberculosis, an injured knee and rotator cuff, and an undiagnosed condition that left him with an abnormally low white blood cell count.

38. Mr. Fall was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

39. Following the attack on May 1, 2020, Mr. Fall was moved to solitary confinement until his transfer from BCHOC on or around May 26, 2020.


Plaintiff Guillermo

40.  Mr. Guillermo was detained at BCHOC from January 22, 2020, to December 1, 2020, when he was deported to the Dominican Republic.

41. Following the attack on May 1, 2020, Mr. Guillermo was placed in solitary confinement twice.


Plaintiff Diego Galindo

42. Mr. Galindo was detained at BCHOC from August 2019 until May 2020, when he was transferred to another facility and ultimately deported to Honduras.

43. Mr. Galindo was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

44. Following the attack on May 1, 2020, Mr. Galindo was moved to solitary confinement for three weeks.

Plaintiff Shigla

45. Mr. Shigla was detained at BCHOC from January 2020 until he was deported to Ecuador in on June 9, 2020.

46. Mr. Shigla was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

47. Following the attack on May 1, 2020, Mr. Shigla was moved to solitary confinement for about a month.

Plaintiff Armijos

48. Mr. Armigos was detained at BCHOC on January 8, 2020, until he was deported to Ecuador on September 5, 2020.

49. Mr. Armijos was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

50. Following the attack on May 1, 2020, Mr. Armijos was moved to solitary confinement for thirty-one days.

Plaintiff Guallán Tixi

51. Mr. Guallán Tixi was detained at BCHOC beginning in January 2020.

52. Mr. Guallán Tixi was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

53. Following the attack on May 1, 2020, Mr. Guallán Tixi was moved to solitary confinement for about 40 days.

Plaintiff Lucas

54. Mr. Lucas was detained at BCHOC beginning on March 3, 2020.

55. Mr. Lucas arrived at BCHOC with long standing kidney problems.

56. Mr. Lucas was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

57. Following the attack on May 1, 2020, Mr. Lucas was moved to solitary confinement for about 35 days.

Plaintiff Wafula

58. Mr. Wafula was detained at BCHOC beginning on August 2, 2019.

59. Mr. Wafula arrived with PTSD from violence he experienced in his home country and previously dislocated his patella in his knee twice, giving him knee problems.

60. Mr. Wafula was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

61. Following the attack on May 1, 2020, Mr. Wafula was moved to solitary confinement for about two months.

Plaintiff Lewis

62.   Mr. Lewis was detained at BCHOC beginning in August 2019.

63.   Mr. Lewis was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

64.   Following the attack on May 1, 2020, Mr. Lewis was moved to solitary confinement for about two months.

Plaintiff Menjivar Rojas

65.   Plaintiff Menjivar Rojas was detained at BCHOC from July 2019 until July 2020.

66.   Mr. Menjivar Rojas arrived at BCHOC with asthma and prescription glasses.

67.   Mr. Menjivar Rojas was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

68.   Following the attack on May 1, 2020, Mr. Menjivar Rojas was moved to solitary confinement for about one month and a half.

Plaintiff Pillco Morocho

69.   Plaintiff Pillco Morocho was detained at BCHOC from December 6, 2019, to November 15, 2020.

70.   Mr. Pillco Morocho was held in Unit B of BCHOC until May 1, 2020, the day of the May 1st incident described below.

71.   Following the attack on May 1, 2020, Mr. Pillco Morocho was moved to solitary confinement for 45 days.

Plaintiff Gomes

72.   Mr. Gomes has been detained at BCHOC beginning in October 24, 2019.


Plaintiff Da Graca

73.   Mr. Da Graca was detained at BCHOC from September 16, 2019.

74.   Mr. Da Graca was detained in Unit 2 East of BCHOC throughout his time in detention.

75.   Mr. Da Graca spent 40 days in solitary confinement.


Plaintiff De Carvalho

76.   Mr. De Carvalho was detained at BCHOC since November 4, 2019.

77.   Mr. De Carvalho spent 45 days in solitary confinement.


Plaintiff Prado

78.   Mr. Prado was detained at BCHOC from April 2019 to December 2020.

79.   Mr. Prado arrived at BCHOC with asthma, prescription glasses, PTSD, and a metal rod
      implant from when police officers shot him in Brazil.

80.   Mr. Prado was housed with the general population of prisoners serving criminal
      sentences in Unit 2 East and then was held in Unit B until May 1, 2020, the day of the
      May 1st incident described below.

81.   Following the attack on May 1, 2020, Mr. Pillco Morocho was moved to solitary
      confinement for 60 days.


Plaintiff Joao Fernandez

82.   Mr. Fernandez was detained at BCHOC since November 8, 2019.

83. Mr. Fernandez arrived at BCHOC with latent tuberculosis.

Plaintiff Mario Battistotti

84. Plaintiff Battistotti was detained at BCHOC on March 5, 2020, until he was transferred to Plymouth on September 11, 2020, and later to Batvia on December 18, 2020. He was released from Batvia on February 17, 2021, back home to New York City.

85. Mr. Battistotti arrived at BCHOC with an established diagnosis for asthma and pre-existing torn meniscus in his knee which caused him chronic pain.

86. Mr. Battistotti was held in Unit B of BCHOC until May 1, 2020, the day of the May 1stt incident described below.

87. Following the attack on May 1, 2020, Mr. Battistotti was placed in solitary confinement for many days.

**People Detained at Bristol County House of Corrections were at a Known Elevated Risk of COVID-19 Transmission, Infection, and Illness.**

88. COVID-19 is a deadly virus that is easily transmitted and has caused over 5.5 million deaths at the time filing this lawsuit.

89. The COVID-19 virus can severely damage lung tissue, which requires an extensive period of hospitalization and rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. More is learned each passing day about the extent of permanent injury that may be caused by COVID-19.

90. Any adult who contracts the virus may experience life threatening symptoms and those with preexisting conditions, such as being immunocompromised, makes an individual

especially susceptible to having serious complications in contracting COVID-19, often leading to death.

91. People of all ages and medical backgrounds who have experienced serious cases of COVID-19 describe painful symptoms, including vomiting, severe diarrhea, relentless shivering, and suffocating shortness of breath.

92. People who experience serious cases of COVID-19 who do not die can expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity.

93. Infectious diseases that are communicated by air or touch, like COVID-19 are more likely to spread in these confined settings and crowded environments.

94. BCHOC was a "congregate environment" where people live and sleep in close proximity and it was impossible for people to maintain the recommended distance of 6 feet from others, especially because people must share or touch objects used by others.

95. Immigration detention facilities like BCHOC had an even greater risk of infectious spread because of overcrowding, the high number of vulnerable people detained, limited access to hygiene products, and scant access to medical care.

**Defendants Continuously Ignore Plaintiffs' Requests for Protection from COVID-19 and the Imminent Danger of Infection in their Facility**

96. From the beginning of the COVID-19 pandemic, ICE, BCSO, and individual Defendants Sheriff Hodgson, Superintendent Souza, and Director Lyons failed to take suitable precautions to limit the spread of the virus.

97. Instead of implementing social distancing measure or taking affirmative measures to reduce the detainee population, they continued to house the same number of detainees or increase the number of detainees.

98. Subsequent reductions in population occurred through the course of ordinary immigration proceedings, or through orders of the District Court for the District of Massachusetts.

99. In February and March 2020 as news about the pandemic spread to the men in BCHOC, the detainees grew increasingly fearful about the unsanitary facility since it became clear that ICE would not provide the necessary supplies or implement measures to keep the detainees safe.

100. Many guards refused to wear masks and gloves as they interacted with detainees, even for tasks such as distributing medicines and foods.

101. On March 18, 2020, a nurse told several detainees that it was "inevitable" that they would contract the virus within thirty days which caused panic in Unit B.

102. In late March 2022, Plaintiffs and other detainees protested for two days to draw attention to ICE's failure to protect them, especially with the lack of cleaning and hygiene supplies, as well as the lack of social distancing in the overcrowded facility.

103. At the same time, Plaintiffs and others drafted a letter to Defendant Hodgson outlining the desperate safety concerns underlying their decision to stop working.

104. Receiving no substantive response from Defendant Hodgson Plaintiffs and others contacted advocacy organizations and wrote letters signed by nearly every detainee in his Unit B demanding that ICE and BHOC take meaningful steps to protect them from COVID 19.

105. In response to the letter, the Defendant Hodgson came to Unit B and told a group of detainees, including Plaintiffs, that he was aware of detainees' advocacy efforts because he had intercepted the letters the detainees sent.

106. Defendant Hodgson warned them to stop their efforts and threatened, "Next time things will get ugly."

**As a Result of the Dangerous Conditions at BCHOC During COVID-19, Several Plaintiffs File *Savino v. Souza* in this Court**

107. On Mach 27, 2020 detainees filed a class action lawsuit, *Savino v. Souza*, No. 1:20-cv-10617-WGY (D. Mass. 2020) ("Savino") in federal district court seeking emergency release due to the unsanitary and overcrowded conditions at BCHOC that would result in the spread of COVID-19, and many deaths of detainees.

108. All Plaintiffs were members of the provisionally class certified in *Savino*.

109. The Savino complaint alleged that the conditions inside BCHOC were unconstitutional and violated the Rehabilitation Act and requested release of individuals to allow for social distancing guidelines to be met.

110. On April 2, 2020 the court put together a list of twelve detainees with no criminal history or pending criminal charges to recommend their release.

111. Defendants informed the court that ICE would voluntarily release six of the twelve listed individuals, but that ICE would not release anyone else.

112. The court ordered bail for three additional detainees at the May 7 hearing and requested the parties supply a list of fifty names to consider for bail.

113. Over the next several weeks, the district court required the parties to submit recommendations for each detained individual and then considered each person individually for bail.

114. On April 23, 2020, this Court ordered that the BCSO to submit a report on the results of COVID-19 testing of the detainees on or before May 7, 2020, the date of the hearing on the detainee's' motion for preliminary injunction.

115. On May 7, the federal district court judge, Judge Young, considered the motion for preliminary injunction and ordered the government (1) to test all detainees and staff who come into contact with detainees; and (2) not to admit any more detainees to this facility.

116. The Court found that the BSCO likely acted with deliberate indifference to the substantial risk of serious harm to the detainee class members because of "three cavernous holes" to their mitigation program—BSCO's rigid blanket objection to the release of any ICE detainees, the lack of testing, and lack of contact tracing.

117. In the order, the Court noted that ICE had "obstinately refused" for more than a month to voluntarily protect the immigrants held at BCHOC.

118. This intransigence, the Court explained, flew in the face of CDC warnings that detention centers are especially susceptible to COVID-19 outbreaks, once the virus penetrates—as it already had in BCHOC by mid-March.

119. The order acknowledged that at that time of issuing the order at least eleven officers or other staff, one immigration detainee, and one state detainee at Bristol County House of Correction tested positive for COVID-19; yet virtually no one was being systematically tested, despite very likely exposure.

120. The court again ordered that all individuals in immigration detention at BCSO, as well as all staff who came into contact with them, be tested for COVID-19 as soon as possible, no new individuals be admitted to immigration detention at the BCSO, and that no transfers be made from BSCO to another facility until the required testing came back negative.

121. Despite the worsening pandemic and conditions in BCHOC, ICE and the BCSO objected the release on bail of to every single individual considered by the court.

122. Defendants continued to attempt to prevent to the release of detainees throughout the entire course of the litigation despite expert declarations informing them of the danger that congregate facilities posed and despite an effective and safe alternative to detention that was currently being ordered by the Court.

123. The release of each Plaintiff was opposed by Defendants despite the known risk Plaintiffs faced by the fact of their detention in BCHOC.

124. Plaintiffs were all put at risk of harm and suffered because of Defendants actions.

125. In particular, Mr. Lucas faced additional risks because of his kidney problems.

126. Mr. Lucas has long standing kidney issues and had made staff at BCHOC aware of his condition when he regularly filed grievances to see a doctor for treatment, but the ICE doctor categorically refused to allow detainees to seek outside medical attention.

127. Kidney issues is a medical condition that puts Mr. Lucas at higher risk of serious harm or death from Covid 19.

128. Defendants did nothing to curb or ameliorate this heightened risk.

129. Mr. Menjivar Rojas and Mr. Prado faced additional risks because of their asthma.

130. Asthma is a medical condition that puts Mr. Menjivar Rojas and Mr. Prado at higher risk of serious harm or death from Covid 19.

131. Defendants did nothing to curb or ameliorate this heightened risk.

132. In particular, Mr. Fernandez faced additional risks because of his latent tuberculosis.

133. Tuberculosis is a medical condition that puts Mr. Fernandez at higher risk of serious harm or death from Covid 19.

134. Defendants did nothing to curb or ameliorate this heightened risk.

**On May 1, 2020, Officers at BCHOC Used Pepper Spray, Attack dogs, and Excessive Force Against All Plaintiffs Detained in Unit B**

135. On or around May 1, 2020, there were heightened tensions at BCHOC because of concerns regarding COVID-19 and possible exposure, and because the *Savino* lawsuit had been filed by Plaintiffs and other detainees against BCSO and its staff.

136. At or around 2 pm on May 1, 2020 a BCSO nurse entered ICE Unit B and called out the names of 10 detainees.

137. The nurse screened the detainees for COVID-19 by asking them a series of questions about their symptoms.

138. The screening was verbally conducted in English and no formal translation or interpretation services were provided.

139. Several of the detainees present, including a number of Plaintiffs speak no English or have Limited English Proficiency and could not understand the verbal screening.

140. Despite this, the detainees complied with the screening assessment.

141. Shortly thereafter, a BCSO staff member entered Unit B, along with a nurse, to transport the ten detainees to the segregated housing unit in the main building, where they would

be tested for COVID-19 and then quarantined in isolation until they received a negative

test result.

142. Plaintiffs were scared. They had heard from correctional officers that new individuals,

including from the criminal population, were being brought to the main building every

day without getting tested.

143. They had heard that a number of employees, including correctional officers and a nurse

and inmates in the main building had been diagnosed with COVID-19.

144. Other detainees heard that testing was being used as a pretext to take certain detainees to

solitary who spoke out against the conditions of the facility.

145. Additionally, another detainee had recently being taken from Unit B to see a doctor but

never came back.

146. The ten detainees expressed concern, anxiety, and fear related to the BCSO's plan to test

and quarantine them.

147. In particular, the detainees explained to BCSO staff that they were afraid that they would

be exposed to COVID-19 in the HSU because that unit serves the entire jail population,

including individuals who had recently arrived at the jail from the community, and that

they were concerned about the conditions that they would face in isolation.

148. They said that they were not opposed to the test itself, only the requirement that they go

to the main building because of the health and safety risk.

149. No detainee physically resisted transfer to the main building at that point

150. Plaintiffs in Unit B and the other detainees reiterated their concerns to the lieutenant who

responded, "I can't fucking do this," before leaving.

151. BCHOC staff then notified a series of directors, including Sheriff Hodgson about the group's hesitations with going to the main building.

152. Defendant Hodgson then decided—in a departure from customary practice— to speak directly and in-person with the detainees about their refusal to submit to testing and isolation.

153. Shortly before 5:30 p.m. on May 1, 2020, Defendant Hodgson entered Unit B and called out for everyone to gather in the control desk in the main room.

154. Defendant Hodgson insisted that the ten detainees, including Plaintiffs, go to the main building to get tested.

155. Defendant Hodgson spoke in English and did not provide translation or interpretation services for those who did not speak English. And, once again, some of the detainees, including Mr. Guallán Tixi, reported that they were not able to understand what was happening or what was being said.

156. Defendant Hodgson threatened that if the detainees did not agree to go to the main building to take the test, they would be taken by force.

157. The ten detainees repeated their safety concerns, and Defendant Hodgson responded to them that he was "done playing games." He stated, "You're going to be tested and if not [willingly], you'll be dragged." One detainee asked, "What happened?" The Sheriff responded, "I'm not playing around. I've heard every phone call you guys make. You've been lying about me."

158. When Defendant Hodgson finished speaking, he instructed a corrections officer to read aloud the names of the ten detainees slated to be transported and tested and reiterated the directive to comply with this order.

159. When Plaintiff Fall, Plaintiff Lewis, and Plaintiff Prado's names were called, they calmly told the officers that they were not feeling any COVID-19 symptoms and that they did not want to go to the main building. The Defendant Hodgson responded, "You're not going? That's a big mistake."

160. At this point, Plaintiff Battistotti, one of the detainees most actively involved in ongoing efforts to advocate for better conditions went to the phone area and called his lawyer.

161. When Plaintiff Battistotti's name was called, the Sheriff saw that he was on the phone and he became visibly angry.

162. Defendant Hodgson then ran towards Plaintiff Battistotti and physically grabbed his arm in attempt to get him to hang up the phone.

163. The phone fell out of Plaintiff Battistotti's hand and he yelled, "What are you doing? Are you crazy? Help! You're assaulting me!"

164. Plaintiff Battistotti's immigration attorney, who was on the phone at the time, reported that he overheard him "crying out as if in pain" and "scuffling sounds" before the phone call was terminated.

165. A group of detainees and correctional officers ran over to Plaintiff Battistotti and the Defendant Hodgson, and an officer grabbed Plaintiff Battistotti by the neck and attempt to handcuff him.

166. Detainees and correctional officers attempted to separate the parties. Some of the surrounding correctional officers grabbed the Sheriff and took him out of the room.

167. Then, one of the corrections officers, Doe #1 deployed several bursts of chemical agent at Plaintiffs Fall, Galindo, Shigla, Armijos, Guallán Tixi, Lucas, Wafula, Lewis, Menjivar Rojas, Pillco Morocho, Prado, Battistotti, and several other detainees.

168. In indiscriminately disbursing the chemical agents, Doe #1 hit all people present in the area regardless of involvement with the aforementioned altercation.

169. Plaintiff Fall was hit in the face, including in his mouths and eyes.

170. Mr. Fall began coughing and crying and his nose began running. He was in extreme pain and could barely see. His eyes hurt to open, and he did not regain his ability to see for some time

171. Mr. Lucas was hit in the face, including pepper sprayed in the eyes.

172. Mr. Lucas could not see or breathe, and he began coughing violently. He was unable to see for at least an hour. Mr. Lucas feared he was going to die.

173. Mr. Wafula was also hit in the eyes. Mr. Wafula's eyes burned intensely, and he became unable to see properly.

174. Mr. Menjivar Rojas was sprayed in the face for approximately 30-40 seconds. Mr. Menjivar Rojas felt an intense burning pain in his eyes and could not see well.

175. Mr. Menjivar Rojas also has asthma. The pepper spray made him unable to breathe.

176. Mr. Pillco Morocho was also sprayed in the eyes. He was blinded by the pepper spray.

177. Those that were sprayed began coughing, wheezing, and/or struggling to breathe.

178. BSCO staff then released additional gas or chemical agents into the unit.

179. All detainees on the unit began coughing, choking, and crying, some began pounding on walls, stacking plastic furniture and writing the word "Help" on the walls and windows.

180. Some detainees, including Mr. Guallán Tixi, attempted to get on the phone to ask for help but the telephone lines into Unit B were disconnected. When this happened, it caused even more fear and anxiety from the detainees.

181. This commotion and gassing conduct continued in earnest for approximately five minutes.

182. By 6:10 pm, the commotion had subsided, and the vast majority of detainees were going about their usual business, walking around the unit, sitting in chairs, laying in bunk beds, and using the phone.

183. Despite the calm state in Unit B sixteen SRT officers, the BSCO K9 Division, and several other corrections officers, as well as BCSO leadership, including Defendants Hodgson and Souza, gathered outside of Unit B.

184. The entire K9 Division responded with all active-duty dogs, three of which were muzzled and the rest of which were not.

185. The SRT Bravo Squad Leader (Doe #2) was armed with a flash bang grenade. In addition to chemical agent spray canisters and 24-inch collapsible batons, SRT officers were also armed with two polycaptor anti-riot shields, two shotguns with beanbag rounds, two pepper-ball launchers, and two battering rams.

186. Shortly before 7:15 pm, the door to the unit suddenly burst open and sixteen SRT officers led by the SRT Squad Leader (Doe # 2).

187. Doe #2 began throwing flash bang grenades which emitted a loud explosion and gas, and yelled, "Get on the ground!"

188. One of the grenades hit Mr. Pillco Morocho's knee as it was thrown and he began to bleed.

189. Another flash bang grenade detonated a few feet away from Mr. Prado and the other detainees.

190. Officers shot pepper-balls as they entered the unit moment of entry by various SRT officers, even before the detainees could have reasonably been expected to comply with orders to get on the ground.

191. The officers also shot detainees with what appeared to be rubber bullets.

192. Mr. Armijos, Mr. Lewis, and Mr. Prado were struck several times by rubber bullets.

193. Defendant K9 officers deployed "muzzle hits" on Plaintiffs and other detainees who were already on the ground and not combatting or assaulting staff.

194. Mr. Shigla, Mr. Guallán Tixi, Mr. Wafula, and Mr. Prado were just some of those people attacked by a dog.

Plaintiff Fall's Experience

195. Plaintiff Fall retreated to the bathroom to wash pepper spray from his eyes and body and then laid down on the floor. When officers discovered him, they yelled at Plaintiff Fall to get on the floor, Plaintiff Fall said, "I am already on the floor," and in response the officer told him "Shut the fuck up."

196. Officer Doe #3, stepped onto Mr. Fall's neck with his leg and yanked his hands together behind his back to zip tie them extremely tight.

197. Doe #4 then emptied an entire can of pepper spray on Mr. Fall's face while Doe #3 pressed down on Mr. Fall's neck with his knee. Other Doe officers #4 and #5 kicked him over and over again.

198. Because there was glass on the floor in the bathroom, when one of the Officer Doe #3 kicked him in the head, a piece of glass sliced into his eyelid, and he began to bleed.

199. Although Mr. Fall was already on the floor, face-down and not resisting, Doe Officers #4 and #5 continued to stomp their feet on him for a prolonged period of time and yelled at him to stay down. Mr. Fall just kept repeating, "I am already on the floor, I am already on the floor."

200. While he was being beaten, Doe #3 continued to kneel on Mr. Fall's dug his heel into Mr. Fall's right calf, just below the knee. Doe #3 ground his heel again and again into Mr. Fall's leg causing him immense pain.

201. While Mr. Fall was beaten by correctional officers in the shower, one of those officers (Does #3-#5) yelled, "You fucking bitch-ass n---er," at him. As Mr. Fall was being dragged out of the shower area, the officer who was holding him said, "I've got you, n---er."

202. Mr. Fall heard another detainee tell the officer, "Stop hurting [Mr. Fall]! You cant do that to him—he has rights!" In response, the officer said, "Shut the fuck up. You bitches are a bunch of immigrants without papers. You have no rights."

203. Mr. Fall was then dragged outside, where his shoes were removed, and he was forced to kneel facing the wall.

Plaintiff Galindo's Experience

204. When the SRT officers entered the unit, guards, Doe #6 and other officers restrained Mr. Galindo by pinning him down, zip tying him, and chaining him.

205. During this process, Doe #6, also lifted Mr. Galindo, pinned him against a wall with his knee digging into to Mr. Galindo's back, causing Mr. Galindo severe pain.

Plaintiff Shigla's Experience

206. When the guards entered the unit, Mr. Shigla hid in his bunk in fear.

207. Soon thereafter a guard, Doe #7, found Mr. Shigla in his bunk. The guard repeatedly beat
Mr. Shigla on the back with the baton and shot him five times with rubber bullets.

208. Doe #8 also instructed his K9 dog to attack Mr. Shigla. The dog then violently attacked
him.

Plaintiff Armijo's Experience

209. Upon entering the unit, Doe officers #9 and 10 shot Mr. Armijos several times with
rubber bullets.

210. Doe officer #10 roughly zip-tied and forced Mr. Armijos to the ground. The zip-ties were
painful and cut circulation from Mr. Armijos's hands.

211. As a result of being restrained in this manner, Mr. Armijos suffered injuries to his
shoulder and lower abdomen

Plaintiff Guallán Tixi's Experience

212. Mr. Guallán Tixi had a previously broken foot and hand at the time of the May 1st
incident.

213. When the officers burst into the unit, Mr. Guallán Tixi was close to his bed near the
unit's laundry room.

214. Confused from the flash bang grenade and disoriented by the thick gas, Mr. Guallán Tixi
entered the laundry room and hid behind one of the washing machines. He could hear
other people screaming and begging for help.

28

215. When the Doe Officers #11 and #12 eventually found Mr. Guallán Tixi behind the washing machine, Mr. Guallán Tixi told them in Spanish, "My foot is broken, my hand is broken" and he also tried to use hand signs to signal that he was injured. The officers ignored him.

216. Does #11 and 12 then grabbed his arms and twisted them behind his back, zip tying them tightly. They forced him to lie on the floor.

217. Once zip tied, both stomped on Mr. Guallán Tixi's neck.

218. The officers' violence cause Mr. Guallán Tixi to tremble and cry because he felt overwhelmed and feeling like he was living a nightmare.

219. Mr. Guallán Tixi saw the officers tearing apart detainees' beds. When the officers Does #11 and 12 noticed that Mr. Guallán Tixi could see what the other officers were doing they stomped on his neck yet again.


Plaintiff Lucas's experience

220. Mr. Lucas ran into the laundry room and sat by the washing machines to wait for the SRT officers to find him.

221. Officers came into the laundry room, grabbed Mr. Lucas and dragged him to the main room.

222. They handcuffed his arms behind his back so tightly that they cut the skin on his wrists.

223. Doe #13 jammed his knee into Mr. Lucas's neck. Doe #15 began to beat Mr. Lucas with a baton as Doe # 14 moved his knee to Mr. Lucas's back.

224. While Mr. Lucas was pinned to the ground, other another officer, Doe #15 pepper sprayed his face.

29

225. At no time did Mr. Lucas physically resist the officers.

Plaintiff Wafula's experience

226. Three officers, including Does #16-17, quickly approached Mr. Wafula in riot gear and with a dog, throwing him roughly onto his knees and then flat onto the ground.

227. This caused him significant pain because he had twice previously dislocated his left patella.

228. The officers jerked his arms behind his back and zip-tied his hands tightly together, hurting his wrists.

229. While Mr. Wafula was lying on the ground with his hand tied behind his back, Doe #16 again pepper sprayed him in the face, causing an intense burning sensation and making it extremely difficult for him to breathe.

230. Mr. Wafula was still disoriented from the flashbang, so he started to panic because he didn't know what the officers were going to do to him.

231. The officers then dragged Mr. Wafula along with the other detainees into the recreation yard and forced them to kneel on the concrete facing a wall. They removed his shoes and searched him and took a head count.

232. Mr. Wafula heard officers yelling and reflexively looked back in the direction of the shouting where he saw officers grabbing two other detainees. One of the officers saw him looking toward them and said, "That's it."

233. The officer, Doe #17, then approached Mr. Wafula, dragged him to the door of the recreation yard and told him to kneel on the floor.

234. Mr. Wafula informed the officer that he had a knee problem and could only kneed slowly, but the officer tied to push him down forcefully and quickly.

235. Even as he repeated, he had a bad knee, the officer quickly pressed him to the ground, pressing his face against the fence while he screamed in pain.

236. Doe #17, pressed a knee against the side of Mr. Wafula's face, making Mr. Wafula carry the officer's full weight and causing injury to Mr. Wafula's jaw.

237. Doe #16 and 17 pinned down Mr. Wafula's legs and zip tied them.

238. Defendant Hodgson saw the interaction as well as Major Bulger who recorded it.


Plaintiff Lewis's experience

239. Mr. Lewis could not see after the officers fired pepper spray balls. He was crying and coughing from the spray.

240. Terrified, Mr. Lewis ran to a nearby room ("the movie room") and lay down on the ground.

241. He heard someone say, "there's one in the movie room," after which several officers entered the room.

242. The officers, Does #18 and #19 found Mr. Lewis and began to stomp on Mr. Lewis with their boots and shot him repeatedly with rubber bullets which were intensely painful. He had cuts on his back from the beating.

243. Although Mr. Lewis was already on the floor, face-down and not resisting, Doe #18 and #19 continued to shoot at and stomp on him and yelled at him to stay down.

244. Mr. Lewis repeatedly said, "I'm already down," but the officers continued their abuse.

245. Doe # 18 handcuffed Mr. Lewis. While he was on the ground in handcuffs, Doe # 19 emptied an entire can of pepper spray in Mr. Lewis's face holding the spray mere inches from his mouth and nose.

246. Mr. Lewis became unable to breathe. He told the officers he could not breathe and one of the officers told Mr. Lewis, "If you move again, I'll kill you."

247. Mr. Lewis told the officer he wasn't doing anything and did not understand why they were doing this to him. The officer responded, "shut the fuck up."

248. Another officer told him he was going to kill Mr. Lewis because he was forced to come to the jail which interrupted his home barbeque with his family.

249. Mr. Lewis, distressed and disoriented, kept attempting to tell the officers that he could not breathe but the officers repeated that they did not care.

250. He tried to wipe his eyes with his shoulder to rid of the spray, but nothing helped. He was never given water to relieve the severe burning in his eyes and he could not open them for an hour.

251. An officer Doe #18 zip tied Mr. Lewis's hands painfully tight, took off his shoes and left him to a ban where he sat around for an hour with his eyes burning.

252. The pain from the cuts on his back was excruciating and he continued to have trouble breathing.


Plaintiff Menjivar Rojas's experience

253. Mr. Menjivar Rojas was in the television area of Unit B with most of the other detainees when the squad of the law enforcement officers and dogs suddenly broke into the unit.

254. Terrified, Mr. Menjivar Rojas ran from the television area to the bathroom.

255. Two other detainees followed Mr. Menjivar Rojas to the shower area and all three lay down on the floor with their hands on the back of their heads.

256. Soon, several officers including Does # 20-21 burst into the shower area.

257. One of the officers, Doe #20, knocked Mr. Menjivar's eyeglasses off his face onto the floor and purposefully stepped on the glasses until they broke.

258. He saw that one of the officers had pepper spray can. He said to the officer, "Please don't spray me, I have asthma."

259. Even so, and although Mr. Menjivar Rojas remained on the floor and did not resist, the officer, Doe #21, pepper sprayed him in the face, then forcefully kneed him several times in the back.

260. Meanwhile, Mr. Menjivar Rojas heard officers yell verbal abuse at him and other detainee, including "fucking immigrants," "this is OUR country," "youre going back to the hole," "we're going to make your life miserable," "fucking bitches" "assholes" "shut the fuck up," and you guys don't belong in this country."

261. With a knee still on Mr. Menjivar Rojas' back, Doe # 20 tightly handcuffed him.

262. As he was being handcuffed, Mr. Menjivar Rojas turned to one of the detainees laying down next to him and saw that the correctional officer had his knee on the detainee's neck.

263. Mr. Menjivar Rojas begged the officer to stop hurting the detainee and told him that they had rights.

264. The correctional officers told him to "shut the fuck up" and that he and the other detainee "don't have any rights" as undocumented immigrants.

Plaintiff Pillco Morocho's experience

265. When the SRT team entered the unit, Mr. Pillco Morocho was standing between the bunks and the unit's television. Limping because of the injury to his knee, Mr. Pillco Morocho moved away from the doors, toward the far set of bunks.

266. As he fled he was shot two times by Doe Officer #22 in the back with rubber bullets.

267. A pair of officers ran up to Mr. Pillco Morocho and Doe #22 stepped on his neck while the other Doe #23 officer lashed Mr. Pillco Morocho's hands behind his back with zip ties.

268. Officer #23 then bent down and pepper sprayed his face while he was zip tied.

269. Mr. Pillco Morocho was yanked to his feet by his arms which were zip tied behind his back. The zip ties were so tight that the skin on his wrists were cut deeply.

270. He was crying and shouting from the pain of the pepper spray and tear gas burning his eyes. He felt as if he were dying.


Plaintiff Prado's experience

271. Mr. Prado ran to the back door close to his bunk bed and put his hands over his head. He got on the ground when officers entered the unit.

272. Mr. Prado was lying on the ground when a tactical officer Doe #24 ran towards him and shot him with rubber bullets.

273. Even though Mr. Prado kept yelling for the officer to stop, the officer continued to shoot him in the shoulder and back.

274. As Mr. Prado continued yelling, one rubber bullet hit the floor and went into Mr. Prado's mouth.

275. Approximately five officers approached Mr. Prado and at least one stepped on his leg, including the leg where Mr. Prado has a metal rod.

276. The officers held each of his legs, pressed a knee into his back and neck, kneed him in the side, and handcuffed him. Mr. Prado could not breathe.

277. As Mr. Prado attempted to alert the officer that he could not breathe, Doe #24 continued to spray him in the face with pepper spray even though he has asthma.

278. An officer told him, "If you can talk, you can breathe."

279. At this point Mr. Prado could not breathe or see well because of the rubber ball lodged in his throat and the pepper spray that he inhaled.

280. After zip typing Mr. Prado's legs and arms, the officers dragged Mr. Prado outside and forcibly put Mr. Prado on his knees with his face toward the wall.

281. One officer also took Mr. Prado's facemask which had fallen of Mr. Prado's face and was wet with pepper spray, and placed it over Mr. Prado's mouth.

282. Mr. Prado was dragged to the recreation area where the nurse asked him what was wrong, but he was unable to talk.

283. Mr. Prado passed out because he was not receiving enough oxygen.

284. Mr. Prado regained consciousness moments later and vomited and feeling the rubber pieces of the bullet in his mouth.

285. As he tried his best to breath, Mr. Prado began to feel dizzy and passed out again.

286. He was taken to the hospital.

Plaintiff Battistotti's experience

35

287. Defendant Hodgson pointed his finger at Mr. Battistotti and said, "You, troublemaker, get pen and paper and come here. Come on, let's go."

288. Mr. Battistotti believed the tension with the Sheriff would escalate, so he phoned his attorney for instruction on how to handle the situation.

289. The Sheriff suddenly grabbed the phone and pushed Mr. Battistotti against the phone booth. Sheriff Hodgson continued to violently shake Mr.Battistotti.

290. Mr. Battistotti was able to turn away from the Sheriff only to be pepper sprayed in his face and mouth by Doe #1.

291. Several of the detainees moved to assist Mr. Battistotti and the Sheriff left the unit.

292. An hour later when the guards entered into the unit, Mr. Battistotti was laying on his bunk, face down, and eyes closed.

293. A few minutes later, Doe officer #25 tightly handcuffed him behind his back, so tightly that he begged the guard to loosen the cuffs, but Doe #25 did not.

294. Doe #25 threw Mr. Battistotti to the floor and put a knee on his back with all his weight on him.

295. Mr. Battistotti screamed "You are breaking my back!"

296. The guard kept his weight on Mr. Battistotti for about 10 minutes.

297. Once outside, Mr. Battistotti was grabbed by the shirt and face by two officers including Doe #26.

298. The officers screamed at him to look at the sheriff and forced him to his knees.

299. Doe #26 then smashed Mr. Battatotti's head into a wall

300. Eventually, Mr. Battistotti was transported to the main building and was seen by medical staff.

*** 

301. SRT officers then took all detainees from Unit B outside one-by-one and placed them, with force, on their knees facing the wall in the recreation pen.

302. Detainees kneeled against the wall for approximately two hours.

303. After this time corrections officers began to load the detainees one-by-one into transport vans.

304. Officers removed the detainees' masks, latex gloves, and shoes before the pat search, putting the detainees and BCSO personnel at increased risk of COVID-19 exposure.


**Injuries and aftermath from May 1, 2020 Incident**

Plaintiff Fall

305. After being transported from Unit B Plaintiff Fall was placed in a holding cell with new inmates off the street were placed in the same cell as him without getting tested for COVID-19.

306. He was then moved to a restrictive solitary cell.

307. He was given no method to decontaminate after being sprayed and was not treated for the glass lodged in his eyes.

308. Because Mr. Fall received no treatment for any of his injuries, he flushed his eyes in his cell, and removed the glass lodged in his eyelid himself.

309. While in the restrictive solitary cell Plaintiff Fall was not allowed to shower for one week.

310. He did not receive bedsheets or shoes for three days and his multiple requests for sanitation supplies but was provided only with a single 1-ounce bottle of shampoo to use for showring and for cleaning his clothing.

311. Plaintiff Fall suffers from low white blood cell count and for the one month he was placed in the restrictive housing unit his physical and mental health continued to worsen.

312. Mr. Fall often got dizzy and experienced chest pains and requested assistance almost daily, but the medical staff never came to see him in a timely fashion.

313. Mr. Fall also struggled, in particular, with his mental health while in solitary. He was left to suffer the psychological injuries from the May 1st attack. He began talking to himself and hearing voices threatening his wife.


Plaintiff Guillermo

314. Following the May 1st attack, Mr. Guillermo was placed in a Restrictive Housing Unit (RHU).

315. As a result of the solitary confinement, Mr. Guillermo experienced heightened stress and anxiety which manifested physically in the form of severe migraine headaches. These headaches caused Mr. Guillermo to suffer significant pain and dizziness and would last all night. Mr. Guillermo requested medical help for the recurring migraines on several occasions.

316. Mr. Guillermo was never permitted to see a doctor regarding his condition while detained at BCHOC. Prior to being detained at BCHOC, Mr. Guillermo had never suffered from migraine headaches.

Plaintiff Galindo

317. Immediately following the May 1 incident, Mr. Galindo was transported to the Restrictive Housing Unit.

318. Ultimately, Mr. Galindo spent a total of three weeks in "the hole," following the May 1st incident, which involved being kept in restraints for 24 hours, 7 days a week, including while eating, showering, and using the bathroom.

319. Mr. Galindo was put in a solitary cell without any toiletries to clean himself or decontaminate.

320. Mr. Galindo suffered extreme stress, anxiety, and depression while he was held in solitary confinement.

321. As a result of the stress and anxiety in solitary, he attempted to commit suicide in the bathroom in the middle of the night.

322. The guards found Mr. Galindo during this attempt and took him to the infirmary.

323. After being released from the infirmary, Mr. Galindo was placed back in solitary confinement for a week even though the facility was aware of his previous suicide attempt.

Plaintiff Shigla

324. Immediately following the May 1st incident, Mr. Shigla was transported to the RHU and ultimately spent a total of four weeks there. This involved being kept in restraints for 24 hours, 7 days a week, including while eating, showering, and using the bathroom

325. Mr. Shigla was put in a solitary cell without any clothes and without the opportunity to shower to decontaminate from the pepper-spray used by the guards during the attack.

Because he was denied the chance to decontaminate, Mr. Shigla's eyes and skin were still burning from the pepper spray, which caused him significant physical pain.

326.  Mr. Shigla was left in solitary confinement without food or water for two days.

327. Following the May 1st incident, Mr. Shigla experienced chronic severe back pain. Mr. Shigla repeatedly sought medical treatment for his back pain, including submitted repeated requests for x-rays, but his requests were ignored.

Plaintiff Armijos

328. Immediately following the May 1 incident, Mr. Galindo was transported to the RHU and ultimately spent 31 days in solitary confinement.

329. For the first 3 days of confinement, he was denied medical care for his shoulder injury caused by officers when they forced him to the ground.

330. Additionally, Mr. Armijos requested and was denied a blanket for the first 3 days.

331. Mr. Armijos lived in a cell with toilets connected to other similar cells. When a prisoner would attempt to flush a toilet, it would overflow, covering the floor of his cell in waste.

332. Although Mr. Armijos repeatedly requested shoes or sandals to wear to protect himself from the waste on the floor of the cell, his requests were denied, forcing him to walk barefoot on the unsanitary floor of his cell. This was especially troublesome because COVID-19 created a further risk in remaining in unsanitary conditions.

333. The conditions in his cell were so bad that Mr. Armijos frequently found himself unable to eat.

Plaintiff Guallán-Tixi

40

334. Despite the serious attack he had just experienced, BCHOC staff conducted only a negligible medical check on Mr. Guallán Tixi. The nurses could not communicate with Mr. Guallán Tixi, and no further medical services were provided.

335. Immediately following the May 1 incident, Mr. Guallán-Tixi was transported to the RHU ultimately spent about 40 days in solitary confinement.

336. Mr. Guallán-Tixi spent days after the incident with a fever, headache, and physical pain throughout his body. He received no further treatment for his injured hand and foot, both which continued to have lasting pain.

337. Mr. Guallán-Tixi was not permitted to shower for seven days following the May 1st assault.


Plaintiff Lucas

338. The officers took Mr. Lucas and others to the medical unit. They saw him trembling and noted that he had submitted mental health requests, indicating that he would be taken to suicide watch.

339. Mr. Lucas vehemently denied being suicidal but the staff ignored him. The officers placed Mr. Lucas on suicide watch in the RHU where he spent about 35 days.

340. They took all of his clothes, leaving him naked for a week.

341. He was only provided with a single bedsheet and a filthy, reeking mattress.

342. ICE did not allow him to shower or brush his teeth that week.

343. Despite classifying him as suicidal, no additional steps were taken to treat or monitor his mental health.

344. Staff refused to provide him with medical care for the continued chest pain he was experiencing and correctional officers have warned that if he continues to complain about his chest pain, "They're going to put you in the hole." Since then, Mr. Lucas was scared to draw attention to his health problems in fear of being thrown in the RHU.

Plaintiff Wafula

345. The officers put Mr. Wafula in a transport van and took them to medical in the main facility.

346. Mr. Wafula told the nurse that the officers injured his right knee and right wrist. The nurse lifted his pant leg and saw he was bleeding but did not examine it further. The interaction lasted two minutes.

347. The nurse gave him a band-aid but no other medication or treatment and ignored his wrist pain.

348. Following the visit to medical he was taken to the RHU where he remained in solitary for the next two months.

349. When Mr. Wafula asked for food on the first night, an officer laughed at him and told him, "You should have thought about what you were doing." He did not receive food until the next day.

350. During the first few days in solitary, Mr. Wafula slept without bed sheets or a blanket and was not given shoes, so he was very cold.

351. Mr. Wafula suffers from PTSD from what he has experienced in his home country. His PTSD was aggravated during his time in the RHU and he began to see things and hear voices that are not present in reality.

352. Mr. Wafula repeatedly requested mental health services but has repeatedly ignored. He has asked for medication to help with his anxiety but did not receive a response for over a month, despite several requests and grievances

Plaintiff Lewis

353. Mr. Lewis was taken to see a nurse following the May 1st attack. He told her he could not see anything. The nurse provided no medicine or other relief.

354. He was later thrown in the shower but he was not provided with supplies to clean himself or the spray off his skin, so the water simply exacerbated the burning sensation.

355. Mr. Lewis was then taken to the RHU where he stayed for two months.

    His skin still burned from the pepper spray, and he was not permitted to take a shower again for days. For weeks after May 1st, Mr. Lewis's skin burned every time he took a shower.

356. Mr. Lewis's cell was filthy, and they did not provide him with cleaning supplies or personal hygiene supplies.

357. Mr. Lewis was not allowed to have shoes or socks and was not given bedsheets or blankets, so he felt as if his feet were freezing, and they became painful from the cold.

358. He feared contracting COVID in these conditions.

359. His confinement in the RHU took a toll on his mental health and he frequently had nightmares.

360. Mr. Lewis frequently requested mental health support but in response only received books or puzzles which did nothing to alleviate his suffering.

Plaintiff Menjivar Rojas

361. Mr. Menjivar Rojas was transported to the medical unit and he told the nurses that his eyes were burning, could not see well, and was having difficulty breathing because the pepper spray interrupted his asthma.

362. One of the nurses for Unit B told a correctional officer that a few of the detainees had health conditions that required attention, including difficulty breathing, but the officer ignored her. Because of Mr. Menjivar Rojas's asthma, which had been exacerbated during the attack from pepper spray, this was particularly troublesome.

363. Mr. Menjivar Rojas was taken to the RHU where he spent about a month and a half.

364. His eyes burned from the pepper sprayed for four days following May 1, particularly when he took a shower.

365. He was placed in a cell flooded with water and sewage from a backed-up toilet, and because his shoes had been confiscated, he was forced to wade through the sewage water with only socks on.

366. On his first night in the RHU, the cell smelled so strongly of fecal matter that Mr. Menjivar Rojas became increasingly nauseous and vomited.

367. During his first week in solitary confinement, Mr. Menjivar Rojas asked correctional officers for cleaning supplies multiple times, but they refused his requests.

368. Eventually Mr. Menjivar Rojas had to do his best to clean his sewage-and-water-laden cell with personal hygiene products, like shampoo and soap.

369. Because the officers also refused his requests for paper towels, Mr. Menjivar Rojas had to rip off part of his clothes to use as a cleaning towel.

370. The assault and conditions in the RHU were damaging to Mr. Menjivar Rojas's mental health.

371. He started having nightmares and lived in a state of general anxiety. He also began to have frequent panic attacks, during which his heart raced, had trouble breathing, and he felt as if he was dying.

372. He cannot remember spending more than three days without having a panic attack during his time in the RHU.

373. He also has repeated flashbacks to the May 1st assault.

374. He repeatedly informed officers and nurses of his panic attacks and asked for medical help but his request for mental health treatment went ignored for weeks

Mr. Pillco Morocho

375. Mr. Pillco Morocho was taken to the medical unit and was given Motrin for his back and knee pain but his knee was never cleaned and remained bloody for two days following the attack.

.Mr. Pillco Morocho was placed in the RHU where he remained for 45 days.

376. When he arrived, officers removed all of Mr. Pillco Morocho's clothes and left him naked for two days, with only a small towel for modesty and for warmth, in a filthy cell. He was also not permitted to fully clean himself in a shower for a week, although his skin was constantly burning from the pepper spray and tear gas.

Mr. Da Graca

377. Mr. Da Graca was put in solitary for about 40 days.

378. During Mr. Da Graca's time in isolation he suffered a serious shoulder injury. While Mr. Garca was in handcuffs travelling to and from the showers, Mr. Da Graca fell hard on the steel stairs and could not break his fall with his hands.

379. When BCHOC guards observed Mr. Da Graca's fall on the facility's cameras, they lifted him off the floor and took him back to his isolation cell.

380. About a month after the injury occurred, x-rays were taken of Mr. Da Graca's shoulder and leg, although he received no MRI test, calcium test, or ultrasound examination as is often standard in such injuries.

381. Mr. Da Graca was diagnosed with a rotator cuff injury. He was told that he will require surgery to repair his rotator cuff, but he received no such surgery.

382. He has also been told that he should have received physical therapy on his shoulder, but he only received one short session at BCHOC.


Mr. De Carvalho

383. Mr. De Carvalho was one of several detainees who spoke up regarding the inhumane conditions at BCHOC after the May 1st attack and the facility's response to the COVID-19 pandemic. The group requested information from the guards regarding how the detainees should protect themselves.

384. After voicing his concerns Mr. De Carvalho was forced to the ground, cuffed, and taken to solitary confinement. Even though there was no danger of violence, the officers cuffed Mr. De Carvalho behind his back and twisted his arm, injuring his shoulder.

385. Mr. De Carvalho spent 45 days in solitary.

386. Being in solitary left him to feeling paranoid, depressed, and that he had to "look over his shoulder."

Mr. Prado

387. When he woke up from passing out from the May 1st attack, he was being transferred into the ambulance and transported to St. Luke's Hospital with symptoms of respiratory distress.

388. While he was in the hospital he was handcuffed to the bed with two officers at his side.

389. Once Mr. Prado's condition stabilized, he was put on observation status.

390. Despite this fragile condition, the correctional officers who were at Mr. Prado's side verbally threatened and physically assaulted him. They grabbed his injured leg, twisted it and asked, "Is this the leg? Do you feel pain?"

391. One officer, held his cell phone up to Mr. Prado and played audio which said "I hope you die slowly" in Portuguese and asked, "does that sound right?"

392. The officer proceeded to make disparaging jokes about Brazil and warned Mr. Prado that he would "pay" when he got back to the detention facility.

393. The officer further threatened that he would be transferred to Alaska where he had to serve a longer sentence.

394. When Mr. Prado asked the officers to release the handcuffs because they were tight, the officers pressed the handcuffs tighter.

395. Mr. Prado was discharged and brought to the medical area at BCHOC.

396. On May 2, Mr. Prado was taken to the RHU where he stayed in solitary confinement for 60 days.

397. He was still covered in pepper spray, unable to talk or walk properly because of the injuries he sustained.

398. Despite his injuries, he was not examined by a doctor at BCHOC for several weeks.

399. He was not given a mask or other way to prevent COVID 19 until May 4th.

400. It was not until May 7 that Mr. Prado received paper and hygiene kits, underwear, and clean uniforms.

401. After being placed in solitary, Mr. Prado's mental health deteriorated. This included becoming depressed, losing weight, experiencing frequent migraines and suffering from memory loss. This worsened as he felt threated by the correctional officers tightening his cuffs and threatening him with more jail time.

Plaintiff Battistotti

402. Mr. Battistoti was taken to receive a medical evaluation and the nurse concluded he was fine.

403. Yet, Mr. Battistoti had indentations on his wrists from the tight flex cuffs which were extremely painful and he was uncontrollably shaking.

404. Mr. Battistotti was taken to the RHU where he remained in solitary for many days.

405. He was then placed in a freezing shower, wearing only a small blue tarp, where the pepper spray was quickly washed.

406. Officer put Mr. Battistotti in a cell, naked, where he remained for three days under 24-hour surveillance.

407. Mr. Battistotti was put on suicide watch despite being cleared as not a suicide risk.

408. Eventually, the round the clock surveillance stopped, and Mr. Battistotti was given clothes, but remained in segregation.

409. During this time, Mr. Battistotti continued to experience intense pain and swelling due to the injuries he incurred during the May 1 incident.

410. He was suffering from hemorrhoids and bleeding badly. He requested medical attention, that request was also denied.

411. Eventually, Mr. Battistotti was taken to another section of the RHU where he was housed with other detainees from ICE B.

412. In this area, the toilet was never cleaned and did not work properly. The toilet often overflowed and made a mess on the floor.

413. Mr. Battistotti injured his foot on the curb of the shower. Mr. Battistotti requested medical assistance which was finally seemingly granted however BCHOC refused him a wheelchair or crutches, so it was impossible for him to reach the doctor.

414. Adding to his anxiety, the guards would often start rumors among the inmates that Mr. Battistotti was a child molester, causing inmates to intimidate him by banging on his cell and calling him names.


**The Massachusetts Attorney General Office Conducts Their Own Investigation and Finds that Detainees Rights for Violated, Resulting in the Closing of BCHOC**


415. After the May 1 Incident, the Special Investigations Unit ("SIU") of BCSO opened an investigation into the attack.  The Massachusetts's Attorney General's Office ("the AGO") had many "concerns about the integrity and independence of the investigation," including that BSCO did not make efforts to determine whether the extent of force used

was appropriate and that BSCO leadership may have influenced the contents of incident reports filed by BCHOC staff.

416. Subsequently, on May 5, 2020, the Civil Rights Division of the Massachusetts Attorney General's Office ("the AGO") opened an investigation into the May 1,2020 attack after the AGO received multiple complaints that BCSO personnel, including Defendant Hodgson, used excessive force against detainees.

417. The AGO concluded that institutional failures at BCHOC and poor decisions by BCSO leadership "culminated in a calculated—that is planned and deliberate—use of force against the ICE B detainees that was disproportionate to the security needs at the time and the unnecessarily caused, or risked causing, harm to all involved."

418. The AGO found that the evidence supports the conclusion that the May 1st attack violated detainees' rights under the Fourteenth Amendment and the Massachusetts Declaration of Rights.

419. Furthermore, the AGO concluded that the BCSO acted with deliberate indifference to a substantial risk of serious harm to the health of the detainees in using an excessive amount of pepper spray, including against detainees with respiratory conditions.

420. Finally, the AGO found that many detainees were not given adequate medical attention following exposure to pepper spray nor given sufficient opportunity to decontaminate.

421. The AGO ultimately recommended a series of steps the BCSO should undergo in order to address the systemic constitutional violations that resulted in this May 1st attack.

422. Most notably, the AGO recommended that the Homeland Security terminate its ICE contract with Bristol County Sheriff's Office given the clear evidence that the BSCO violated the Detention Standards.

423. It also recommended that DHS should terminate its 287(g) agreement with the BCSO so that the BCSO can no longer participate in immigration enforcement.

424. On May 20, 2021, Homeland Security Secretary Alejandro Mayorkas directed ICE to discontinue their contract with the Bristol County Sheriff's Office as well as to close Bristol County Detention Center because of the government's conclusions of the mistreatment of detainees during the May 1, 2020, attack.

425. In a memo to ICE Acting Director Johnson, Secretary Mayorkas stated, "Allow me to state one foundational principle:  we will not tolerate the mistreatment of individuals in civil immigration detention or substandard conditions of detention."

426. Massachusetts Attorney General Maura Healey commended the termination of the contract noting, "Our extensive investigation and advocacy have made it clear that the Sheriff's Office is not willing to take any steps to protect the rights and safety of detainees."

427. Detainees were systematically transferred out of the detention center either to be released, deported, or transferred to another facility.

**Continuing Harm Suffered by Plaintiffs**

Plaintiff Fall

428. Plaintiff Fall has noticed his health and strength deteriorate. His head hurts constantly, and he suffers from sudden dizziness and chest pains.

429. Mr. Fall has twice sought emergency care are at a medical clinic in Senegal, but they state that they do not have the resources to do a full evaluation.

430. Mr. Fall suffered a large, painful cut on his eyelid from the attacks of officers on the May 1, 2020, and continues to have trouble seeing out that eye.

431. Mr. Fall suffers bruises that lasted a month and his hands still hurt and go numb at times. His index fingers have not regained full range of motion.

432. The May 1st assault reinjured Plaintiff Fall's previously injured knee because the officer ground his heel into Mr. Fall's calf. His knee is not healed and continues to cause him pain. He is unable to sit comfortably and is also unable to walk for very long before feeling debilitating knee, calf, and back pain.

433. The officers in the May 1st incident also severely tore his already injured rotator cuff when they yanked his arms behind his back and zip tied his wrists, dragged him from the bathroom floor, and shoved him into the van. Mr. Fall experiences pain in his shoulder regularly.

434. Mr. Fall lost his ability to perform many of the everyday activities that he was before the attack. Before the attack, Mr. Fall was accustomed to bench press 370 pounds before the accident, now he can no longer do push ups and he is unable to sleep on his right side due to pain.

435. He also has severe shortness of breath, dizziness, and chest pains even when walking.

436. Mr. Fall suffers from constant anxiety and depression as a result of the injuries he sustained at BCHOC. He finds it difficult to speak with his wife and children because he is overwhelmed by feelings of panic, exhaustion, and stress of managing his physical and psychological pain. He has sudden anger and episodes of talking to himself.

437. Once social and easy going, Mr. Fall is now fearful and withdrawn and finds it too stressful and frightening to spend time with others.

438. He had to move out of the home he shared with his mother in order to be alone because it was the only way he feels safe. Several times a week he has panic attacks and nightmares in which he fears he is being pursued by BCHO.

439. Seeing men in uniform or even riding in cars causes him to experience flashbacks or feel disoriented.


Plaintiff Guillermo

440. As a result of the attack and confinement in BCHOC, Mr. Guillermo now experiences heightened stress and anxiety which manifest physically in the form of severe migraine headaches.

441. These headaches caused Mr. Guillermo to suffer significant pain and dizziness and sometimes last all night.


Plaintiff Galindo

442. Mr. Galindo stated that being detained during COVID-19 caused him to experience severe stress, anxiety, and fear. This was especially true because his grandfather passed away while he was detained from contracting COVID 19.

443. Mr. Galindo also experienced extreme back pain from when the guard forcefully pinned him down with his knee.

444. As explained, solitary confinement after the May 1st assault also caused Mr. Galindo to begin to have thoughts of ending his life, resulting in him attempting to commit suicide.


Plaintiff Shigla

445. Upon returning to Ecuador, Mr. Shigla had an x-ray done on his back and was informed he had permanent spinal damage from the May 1st attack.

446. Due to his injuries and despite being only 31 years old, he can no longer sit or stand for long periods of time and cannot lift his arms above his head.

447. Prior to being detained at BCHOC, Mr. Shigla worked in construction. Due to his spinal injuries, Mr. Shigla is no longer able to work in his trade.

448. His detention at BCHOC also caused Mr. Shigla to have worsening physical symptoms of stress and anxiety he was already suffering as a result of the squalid conditions and the facility's poor handling of the COVID-19 pandemic. Prior to his detention at BCHOC and the May 1 incident, Mr. Shigla had no history of mental health issues

Plaintiff Armijos

449. Mr. Armijos's mental health significantly deteriorated following the May 1, 2020 incident and subsequent confinement. Mr. Armijos has suffered a great deal of anxiety and mental anguish, from which he is still presently struggling to recover.

Plaintiff Guallán Tixi

450. As a result of his treatment on May 1st, Mr. Guallán-Tixi suffered acute stomach pain and his genitals became visibly inflamed and infected.

451. After the May 1, 2020 attack it also became exceedingly difficult for Mr. Guallán to open his mouth to breath and his throat became so inflamed that he was constantly coughing.

452. The attack triggered long held emotional trauma from Mr. Guallán Tixi's past including where soldiers in his home country badly beaten Mr. Guallán Tixi by whipping him with the flats of machetes and forced him to eat dog meat.

453. The attack left him mentally and emotionally damaged. He has difficulty remembering events that occurred and even has difficulty remembering content of conversations he just had.

454. These were not typical for him before the May 1st attack—in fact he was able to leave his hometown because of academic success. He is worried that his mind is so emotionally damaged he will not be able to find work again.

455. Mr. Guallán Tixi also dissociates from reality and can still see the Sheriff shooting everyone when he closes his eyes.

456. He has difficulty eating, sleeping and speaking because of the May 1st attack and unhygienic conditions while in ICE custody.

Plaintiff Lucas

457. Mr. Lucas also suffers acute psychological terror as a result of the attack because it triggers his childhood trauma. Mr. Lucas witnessed the aftermath of a massacre carried out by guerillas in his village in Guatemala who killed his grandparents, uncles, and father. Since then, he has been haunted by the memory and avoids dangerous situations.

458. Seeing the guards fathering outside triggered this trauma He has trouble sleeping and suffers from nightmares of having a gun put to his head. He often trembled involuntarily when he was approached by correctional officers.

459. As a result of the attack, Mr. Lucas developed severe chest pain and pain in his left arm, which greatly concern him because of his family's history with heart disease. The chest pain sometimes causes Mr. Lucas to cough up blood.

Plaintiff Wafula

460. Mr. Wafula's wrist was injured as a result of the officers' zip tying his hands too tight and he never received any medical care, even though he requested it many times. His wrists were also in great pain and the marks from his zip ties remained for week.

461. Mr. Wafula has difficulty with his grip, and he cannot do exercises he used to do on a regular basis like pushups or pull ups.

462. His knee is also injured from the officers stepping on his knee.

463. About a month after the incident, he had an x-ray done showing a chipped bone in his right knee.

464. He has constant pain in his right knee and takes painkillers every day. He is unable to run, jog, or stand for more than an hour at a time.

465. He constantly wakes up with his knee feeling numb and is unable to stand in the morning.

466. He has gained weight and is unable to exercise.

467. The May 1st attack also caused his jaw pain to worsen. He wakes up with his jaw tight and shut and is unable to yawn or open his mouth for up to two days.

468. This did not happen before an officer knelt with his full weight on Mr. Wafula's face on May 1st.

469. Mr. Wafula's PTSD was also aggravated by his confinement in BCHCOC and the May 1st attack. He began to see things and hear voices after the May 1st attack, and he constantly feared that officers could assault him at any time.

470. He continues to have frequent nightmares and struggles to sleep.

Plaintiff Lewis

471. Mr. Lewis received lasting cuts from on his back from the beatings on May 1st.

472. The pain was excruciating, and he continued to have trouble breathing for weeks.

473. His wrists were also in great pain and the marks from his zip ties remained for week.

474. His confinement in the RHU took a severe toll on his mental health. Mr. Lewis suffers from nightmares about being shot and beaten by prison guards after the May 1st attack.

475. He remains in a state of hypervigilance as he constantly relives being pepper sprayed in the face or being beaten on the ground.

476. The assault also triggers memories of his long-held trauma related to the violence he experienced as a child in Jamaica, his father's abusiveness and being shot.

Plaintiff Menjivar Rojas

477. As a result of attack, he struggles with severe back and neck pain.

478. He is also unable to lift heavy objects because of his back pain which he did not experience these symptoms before May 1st.

479. Mr. Menjivar Rojas's eyes still bother him to this day.

480. Mr. Menjivar Rojas's mental health was also severely affected. Because of the events at BCHOC he has frequent panic attacks, nightmares, and struggles with anxiety. This causes him to have trouble breathing and his heart races.

Plaintiff Pillco Morocho

481. As a result of the attack, Mr. Pillco Morocho sustained injuries to his knee, back, and foot.

482. Mr. Pillco Morocho has a lasting scar because of the flash bang grenade that hit his knee.

483. He also still has scars on his back from the bullets.

484. He continues to live with backpain from the injury.

485. Mr. Pillco Morocho also experiences severe digestive problems and stomach pain caused by his time in detention.

486. He suffers from persistent diarrhea and stomach pain which he developed from the unsanitary conditions in Unit B and constant hunger while detained.

487. This was exacerbated in the RHU where he could not access canteen food that was necessary to supplement his diet.

488. He also was unable to work in the RHU. Even once outside the RHU, he was unable to resume his cleaning work because he felt he did not have the physical strength or emotional ability because of the trauma.

489. As a result, he could not afford the canteen food necessary for his stomach which exacerbated his condition.

490. Mr. Pillco Morocho's mental health was damaged. He is constantly depressed and experiences recurring fears of sudden violence inflicted by armed officers and dogs.

491. The emotional trauma also manifests physically because he often trembles from stress and fear of unprovoked and violent attack.

492. His fear and lingering physical trauma means that he cannot live a normal life as the incidences weigh heavily on his memory.

Plaintiff Gomes

493. Mr. Gomes has trouble sleeping because the stress and anxiety from his confinement during the Covid-19 pandemic was too painful.

494. Although he never had high blood pressure prior to being detained, it has now become a health issue.

495. Mr. Gomes has stated that he feels worthless and powerless because his complaints about his health and living conditions are ignored, and he cannot do anything else to improve the conditions under which he was being held.

496. He describes his experience as a kind of a nightmare from which he cannot wake up.


Plaintiff Da Garca

497. Mr. Da Graca has continued to have shoulder pain for many months following his injury in solitary.

498. His shoulder pain is so severe that simple actions, like lifting his arm over his head, brushing his teeth, and covering himself with a blanket while he sleeps continue to cause him intense pain.

499. Mr. Da Graca has developed from significant anxiety during his time imprisoned at BCHOC.

500. He has repeatedly experienced alarming bouts of shortness of breath, fits of unprovoked crying, and severe headaches, all brought on by this anxiety.

501. Mr. Da Graca did not suffer from anxiety before he was detained at Bristol.

502. His anxiety is due to a combination of factors, including numerous instances of mental stress which arose from a lack of protection from the COVID-19 virus, in addition to a lack of necessary medical care.

503. He repeatedly sought medical assistance with the on staff nurse for his severe anxiety but received no such care.

504. Mr. Da Graca's detention at BCHOC has led directly to his significant psychological and emotional distress.

505. His time incarcerated in BCHOC has turned him from a healthy man into one afflicted by numerous, potentially lifelong diseases and injuries.

Plaintiff De Carvalho

506. Mr. De Carvalho has felt an overwhelming sense of anxiety while detained at BCHOC, which has caused him to experience severe mental and physical symptoms.

507. Upon his detention at BCHOC and, more specifically since March 2020, Mr. De Carvalho has had trouble sleeping and low energy.

508. Significantly, Mr. De Carvalho lost over 30 pounds (from 206 to 174 lbs.) during his time in detention.

509. Mr. De Carvalho describes his anxiety and depression as being much more pronounced than any other time in his life, including his previous incarceration.

510. Prior to being detained at BCHOC, Mr. De Carvalho was not experiencing anxiety or depression and was enjoying his life.

511. However, he now struggles every day to just get out of bed and doing even the most basic tasks takes a supreme amount of effort.

512. Mr. De Carvalho saw a medical professional while detained who told him that his weight loss was directly related to his anxiety and that it was "pretty easy to see the connection."

513.  His doctor recommended a change in his diet and other minor accommodations to

address his anxiety and weight loss, but BCHOC overruled the medical recommendations and declined to give Mr. De Carvalho access to the treatment the doctor prescribed.

514. Despite the medical visit, nothing changed and never got proper treatment.

Plaintiff Prado

515. Following the May 1 incident, Mr. Prado experienced severe pain and inflammation in his leg.

516. For 30 days, he was unable to stand on his injured leg.

517. He continues to require pain relievers and is unable to run because of the pain he continues to feel.

518. Mr. Prado continues to feel pain and weakness in his lungs when he exercises.

519. His prescription glasses were also broken on May 1st and he was denied glasses for many weeks.

520. When he finally received glasses, he was given generic reading glasses instead of prescription lenses he requires to read.

521. Despite many attempts to acquire the proper glasses over months, he never received them while he was at BCHOC.

522. Because of this, he suffered from headaches, eye strain, and difficulty seeing.

523. Because of the attacks from officers, Mr. Prado now suffers from insomnia and nightmares that involve him not being able to breath.

524. New symptoms of PTSD have manifested including having panic attacks and depressions. Furthermore, every time Mr. Prado feels threatened, he had to work to hold his urine. He also suffers from tremors that impede his ability to write well.

525. Because of Mr. Prado's inability to share time with his family, he feels guilt that he is unable to support them, compounding his PTSD symptoms.

Plaintiff Fernandez

526. Mr. Fernandez experience fear, anxiety, and uncertainty from being detained at BCHOC during COVID.

527. The lack of adequate methods to protect himself exacerbated Mr. Fernandez's distress while in detention.

528. He experienced humiliation, emotional distress and loss of enjoyment of life.

Plaintiff Battistotti

529. To this day, Mr. Battistotti still experiences ongoing pain in his hands and was recently informed by his doctor that he most likely suffered permanent nerve damage.

530. He continues to have chronic pain in his knee and foot.

531. Mr. Battistotti's mental health significantly deteriorated following the May 1 incident and his time in isolation. Mr. Battistotti has seen a marked worsening of his symptoms of anxiety and depression.

532. He often has flashbacks (PTSD)of the trauma inflicted by being assaulted by the Sheriff.

533. He was placed on medication (an anti-depressant/ anti-anxiety) for PTSD. His original dose was ineffective, but ithas since been doubled, resulting in excessive sleep, even in daytime.

**CAUSES OF ACTION**

**Count 1: Violation of Fifth Amendment Right to Due Process - Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement (*Bivens*).**

**All Plaintiffs Against Defendants Sheriff Hodgson, Superintendent Souza, Director Lyons.**

534. Plaintiffs realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

535. The Fifth Amendment to the U.S. Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment. The government violates this substantive due process right when it subjects civil detainees to treatment and conditions of confinement that amounts to punishment or does not ensure the detainees' safety and health.

536. Defendants Sheriff Hodgson, Superintendent Souza, and Director Lyons, acted under color of federal law to subject all Plaintiffs to conditions of confinement that include the imminent risk of contracting COVID-19, a deadly disease for which there is no known understanding of the long-term side effects of exposure.

537. As public health experts in correctional medical care and infectious disease agree, individuals and families in immigration detention are at grave risk of COVID-19 infection.

538. Defendants Sheriff Hodgson, Superintendent Souza, and Director Lyons consistently disregarded requests from Plaintiffs and other detainees to adhere to social distancing measures, provide cleaning supplies, and apply broader testing to protect detainees.

539. Defendants Sheriff Hodgson, Superintendent Souza, and Director Lyons also disregarded this court's orders to take proactive means to address the risk of COVID, consistently disregarding directive to increase testing, and constantly refused to release individuals on bail even when directed by the court.

**Count 2: Violation of Fifth Amendment Right to Due Process – Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement (42 U.S.C. § 1983) All Plaintiffs against Individual Capacity Defendants Sheriff Hodgson and Superintendent Souza**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. The Fifth Amendment to the U.S. Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment. The government violates this substantive due process right when it subjects civil detainees to treatment and conditions of confinement that amounts to punishment or does not ensure the detainees' safety and health.

539. Defendants acted under color of state law to subject Plaintiffs to conditions of confinement that include the imminent risk of contracting COVID-19, a deadly disease for which there is no known understanding of the long-term side effects of exposure.

540. As public health experts in correctional medical care and infectious disease agree, individuals and families in immigration detention are at grave risk of COVID-19 infection.

541. Defendants Sheriff Hodgson, and Superintendent Souza acted under color of state law to subject Plaintiffs to conditions of confinement that include the imminent risk of contracting COVID-19, a deadly disease for which there is no known understanding of the long-term side effects of exposure.

542. As public health experts in correctional medical care and infectious disease agree, individuals and families in immigration detention are at grave risk of COVID-19 infection.

543. Defendants Sheriff Hodgson and Superintendent Souza consistently disregarded requests from Plaintiffs and other detainees to adhere to social distancing measures, provide cleaning supplies, and apply broader testing to protect detainees.

544. Defendants Sheriff Hodgson and Superintendent Souza also disregarded this court's orders to take proactive means to address the risk of COVID, consistently disregarding directive to increase testing, and constantly refused to release individuals on bail even when directed by the court.

545. These Defendants have subjected Plaintiffs to imminent risk of physical, emotional and mental harm in violation of Plaintiffs' rights under the Due Process Clause.

546. Accordingly, these Defendants have subjected Plaintiffs to cruel and unusual treatment that amounts to punishment and that fail to ensure their safety and health which shocks the conscience in violation of the Fifth Amendment of the Constitution.

547. This cause of action for the violation of Plaintiff's Fifth Amendment right is brought pursuant to 42 U.SC. § 1983.

**Count 3: Excessive Force Plaintiffs Fall, Galindo, Shigla, Armijos, Guallán Tixi, Lucas, Wafula, Lewis, Menjivar Rojas, Pillco Morocho, Prado, and Battistotti against Doe Officer #1 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Doe #1 knowingly and indiscriminately used chemical agents against Plaintiffs Fall, Galindo, Shigla, Armijos, Guallán Tixi, Lucas, Wafula, Lewis, Menjivar

Rojas, Pillco Morocho, Prado and Battistotti despite Plaintiffs lack of physical resistance or combativeness.

540. Defendant Doe #1 used chemical agents listed Plaintiffs, as described above. This use was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Doe #1's use of force against listed Plaintiffs was objectively unreasonable.

**Count 4: Excessive Force Plaintiffs Pillco Morocho, and Prado against Doe Officer #2 (42 U.S.C § 1983)**

548. The foregoing allegations are re-alleged and incorporated herein by reference.

549. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

550. Defendant Doe #2 knowingly and indiscriminately threw flash bang grenades at several non-violent and non-resisting detainees. These grenades, as described above, physically injured Plaintiffs Pillco Morocho and Prado.

551. Defendant Doe #2 used flash bang grenades against listed Plaintiffs, as described above. This use was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

552. Alternatively, Defendant Doe #2's use of force against listed Plaintiffs was objectively unreasonable.

**Count 5: Excessive Force Plaintiff Fall Against Does #3-5 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

66

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Does #3-5 knowingly and maliciously used force against Plaintiff Fall as described in paragraphs 193-201. This force included stomping on kicking Mr. Fall and pepper spraying him despite his lack of resistance.

540. Defendant Does #3-5 use of force against Mr. Fall was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Does #3-5 use of force against listed Mr. Fall was objectively unreasonable.

**Count 6: Excessive Force Plaintiff Galindo Against Doe #6 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Doe #6 knowingly and maliciously used force against Plaintiff Galindo as described in paragraphs 202-203. This force included restraining and exerting physical force upon Mr. Galindo.

540. The actions of Defendant Doe #6's against Mr. Galindo were excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Does #6 use of force against listed Mr. Galindo was objectively unreasonable.

**Count 7: Excessive Force Plaintiff Shigla Against Doe #7-8 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Doe #7-8 knowingly and maliciously used force against Plaintiff Shigla as described in paragraphs 204-206. This force included shooting Mr. Shigla with rubber bullets and instructing a dog to attack him.

540. Defendants Doe #7-8's use of force against Mr. Shigla was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Does #7-8 use of force against Mr. Shigla was objectively unreasonable.

**Count 8: Excessive Force Plaintiff Armijos Against Doe #9-10 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Doe #9-10 knowingly and maliciously used force against Plaintiff Armijos as described in paragraphs 207-209. This force included shooting Mr. Armijos with rubber bullets and violently restraining him.

540. Defendant Doe #9-10's use of force against Mr. Armijos was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Does #9-10 use of force against Mr. Armijos was objectively unreasonable.

**Count 9: Excessive Force Plaintiff Guallán Tixi Against Doe #10-11 (42 U.S.C § 1983)**

542. The foregoing allegations are re-alleged and incorporated herein by reference.

543. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

544. Defendant Doe #11-12 knowingly and maliciously used force against Plaintiff Guallán Tixi as described in paragraphs 210-217. This force included violently restraining Mr. Guallán Tixi despite his pre-existing injuries, and stomping on his back and neck.

545. Defendant Doe #11-12's use of force against Mr. Guallán Tixi was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

546. Alternatively, Defendant Does #11-12 use of force against Mr. Guallán Tixi was objectively unreasonable.

**Count 10: Excessive Force Plaintiff Lucas Against Doe #13-15 (42 U.S.C § 1983)**

547. The foregoing allegations are re-alleged and incorporated herein by reference.

548. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

549. Defendant Doe #13-15 knowingly and maliciously used force against Plaintiff Lucas as described in paragraphs 218-223. This force included beating Mr. Lucas and pepper spraying him in the face.

550. Defendant Doe #13-15's use of force against Mr. Lucas was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

551. Alternatively, Defendant Does #13-15 use of force against listed Mr. Lucas was objectively unreasonable.

**Count 11: Excessive Force Plaintiff Wafula Against Doe #16-17 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Does #16-17 knowingly and maliciously used force against Plaintiff Wafula as described in paragraphs 224-236. This force included beating Mr. Wafula and pepper spraying him in the face.

540. Defendants Doe #16-17's use of force against Mr. Wafula was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Does #16-16 use of force against listed Mr. Wafula was objectively unreasonable.

**Count 12: Excessive Force Plaintiff Lewis Against Doe #18-19 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Doe #18-19 knowingly and maliciously used force against Plaintiff Lewis as described in paragraphs 237-250. This force included shooting Mr. Lewis with rubber bullets and pepper spraying him.

540. The actions of Defendants Doe #18-19's use of force against Mr. Lewis was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Does #18-19's use of force against Mr. Lewis was objectively unreasonable.

**Count 13: Excessive Force Plaintiff Menjivar Rojas Against Doe #20-21 (42 U.S.C § 1983)**

542. The foregoing allegations are re-alleged and incorporated herein by reference.

543. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

544. Defendant Does #20-21 knowingly and maliciously used force against Plaintiff Lucas as described in paragraphs 251-262. This force included beating Mr. Menjivar Rojas and pepper spraying him.

545. Defendant Doe #20-21s' use of force against Mr. Menjivar Rojas was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

546. Alternatively, Defendant Does #20-21's use of force against listed Menjivar Rojas was objectively unreasonable.

**Count 14: Excessive Force Plaintiff Pillco Morocho Against Doe #22-23 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Doe #22-23 knowingly and maliciously used force against Plaintiff Lucas as described in paragraphs 263-268. This force included stomping on Mr. Pillco Morocho's neck and pepper spraying him.

540. The actions of Defendants Doe #22-23's use of force against Mr. Pillco Morocho was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Does #22-23's use of force against Pillco Morocho was objectively unreasonable.

**Count 15: Excessive Force Plaintiff Prado Against Doe #24 (42 U.S.C § 1983)**

547. The foregoing allegations are re-alleged and incorporated herein by reference.

548. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

549. Defendant Doe #24 knowingly and maliciously used force against Plaintiff Prado as described in paragraphs 269-288. This force included beating Mr. Prado and pepper spraying him in the face.

550. Defendant Doe #24's use of force against Mr. Prado was excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

551. Alternatively, Defendant Doe #24's use of force against Mr. Prado was objectively unreasonable.

**Count 16: Excessive Force Plaintiff Battistotti Against Defendant Hodgson and Does #25-26 (42 U.S.C § 1983)**

537. The foregoing allegations are re-alleged and incorporated herein by reference.

538. Defendants violate the constitutional rights of immigration detainees when they purposely or knowingly used force against the plaintiff that was objectively unreasonable, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).

539. Defendant Hodgson and Does #25-26 knowingly and maliciously used force against Plaintiff Battistotti as described in paragraphs 289-302. This force included shaking Mr. Battistotti, smashingMr. Battistotti's head into the wall and tightly zip-tying his hands.

540. The actions of Defendant Hodgson and Does #25-26 Mr. Battistotti were excessive, was not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

541. Alternatively, Defendant Hodgson and Doe #25-26's use of force against Mr. Battistotti was objectively unreasonable.

**Count 16: Violation of Rehabilitation Act**
**Plaintiffs Fall, Wafula, Menjivar Rojas, Prado, and Fernando Against the Department of Homeland Security, Immigration and Customs Enforcement, and the Bristol County Sheriff's Office**

542. Plaintiff realleges and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein

543. Section 504 of the Rehabilitation Act requires federal agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

544. DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30; see also 29 U.S.C. §794(a).

545. The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

546. BCSO and BCHOC receive federal funds, in particular, for their detention of civil immigration detainees

547. Mr. Fall's underlying tuberculosis, torn rotator cuff and white blood cell conditions qualify as disabilities for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

548. Mr. Wafula's damaged knees and PTSD qualify as disabilities for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

549. Mr. Menjivar Rojas's asthma qualifies as a disability for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

550.  Mr. Prado's asthma, PTSD and metallic leg qualify as disabilities for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

551. Mr. Fernando's tuberculosis qualifies as a disability for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

552. By failing to provide above listed Plaintiffs with adequate protection from COVID-19 through the only effective means to reduce the risk of severe illness or death, Defendants denied above mentioned Plaintiffs access to programs services or activities such as a safe place to sleep.

553. Defendants' continued detention of Plaintiffs during the COVID -19 constitutes discrimination because it is either disparate treatment of, or at the very least has a disparate impact on, people with qualifying disabilities, like Plaintiffs, who are at severe risk of serious illness or death if they were to contract COVID-19.

554. Additionally, for failing to accommodate Messrs. Wafula, Fall and Prado's physical disabilities during the planned use of force on May 1, 2020, Defendants put those disabled individuals at a higher risk of harm in contrast to able bodied detainees.

555. Defendants knew of these underlying conditions and nonetheless continued their dangerous actions.

556. For these reasons, Defendants' ongoing detention of Plaintiffs violates the Rehabilitation Act.

**Count 17: Violation of Americans with Disabilities Act**
**Plaintiffs Fall, Wafula, Menjivar Rojas, Prado, and Fernando Against the Bristol County Sheriffs' Office**

557. Title II of the American with Disabilities Act of 1990 prohibits discrimination by state and local agencies against individuals with disabilities and requires state agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 42 U.S.C. § 12101

558. BCSO's detention of during the COVID -19 constitutes disability discrimination because it is either disparate treatment of, or at the very least has a disparate impact on, people with qualifying disabilities who are at severe risk of serious illness or death if they were to contract COVID-19.

559. Defendants' failure to provide protection, treatment, or additional accommodations to Plaintiffs, while in Unit B, in solitary confinement, and while being processed for deportation despite having tuberculosis, constitutes as discrimination because of its disparate impact on people with severe risk of serious illness.

560. Defendants' use of pepper spray and failure to consider Plaintiffs' disabilities and other health issues in the May 1, 2020 attack, constitutes discrimination either in its disparate treatment and disparate impact on individuals with qualifying disabilities, such as Mr. Fall.

561. For these reasons, Defendants' ongoing detention of Plaintiffs violates the Americans with Disabilities Act.


562. Mr. Fall's underlying tuberculosis, torn rotator cuff and white blood cell conditions qualify as disabilities for purposes of the ADA.

563. Mr. Wafula's damaged knees and PTSD qualify as disabilities for purposes of the ADA.

564. Mr. Menjivar Rojas's asthma qualifies as a disability for purposes of the ADA.

565.  Mr. Prado's asthma, PTSD and metallic leg qualify as disabilities for purposes of the ADA.

566. Mr. Fernando's tuberculosis qualifies as a disability for purposes of the ADA.

567. By failing to provide above listed Plaintiffs with adequate protection from COVID-19 through the only effective means to reduce the risk of severe illness or death, Defendants denied above mentioned Plaintiffs access to programs services or activities such as a safe place to sleep.

568. Defendants' continued detention of Plaintiffs during the COVID -19 constitutes discrimination because it is either disparate treatment of, or at the very least has a disparate impact on, people with qualifying disabilities, like Plaintiffs, who are at severe risk of serious illness or death if they were to contract COVID-19.

569. Additionally, for failing to accommodate Messrs. Wafula, Fall and Prado's physical disabilities during the planned use of force on May 1, 2020, Defendants put those disabled individuals at a higher risk of harm in contrast to able bodied detainees.

570. Defendants knew of these underlying conditions and nonetheless continued their dangerous actions.

*Federal Tort Claims Act-28 U.S.C. § 1346(b)*

### Count 18: Negligent Maintenance
### (by All Plaintiffs against Defendant United States)

571. The foregoing allegations are re-alleged and incorporated herein by reference.

572. Under Massachusetts law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. *Bennett v. Eagle Brook Country Store*, 557 N.E.2d 1166, 1168 (Mass. 1990).

573. Defendants United States of America, DHS, and ICE owed Plaintiffs a duty of care. There was a special relationship between Mr. Fall since the Defendants reasonably could foresee that they would be expected to take affirmative action to protect Mr. Fall and could anticipate harm to Mr. Fall from failure to do so. *See Irwin v. Town of Ware*, 467 N.E.2d 1292, 1300 (Mass. 1984).

574. They are solely responsible for the custody and maintenance of the facility where detainees have no other means of control over their living space, therefore it was reasonably foreseeable that they were required to take affirmative steps to protect detainees through consistent maintenance of common areas and living space during a deadly virus such as COVID-19.

575. Defendants United States of America, DHS, and ICE published clearly established standards for basic safety and hygiene in detention facilities. Defendants did not follow this internal guidance. See Immigration Customs Enforcement, Performance-Based National Detention Standards on Medical Care (Dec. 2016) (Rule 1.2, 4.5, and 4.8 )

576. Defendants breached that duty because Plaintiffs were subject to dehumanizing conditions of confinement during COVID-19 and was given no protection, social distancing, or cleaning supplies despite repeated requests for additional supplies and care.

577. Defendants' negligent maintenance of BCHOC is was proximate cause of Plaintiff's heightened risk of COVID-19.

578. Plaintiffs suffered possible exposure to COVID-19 as well as emotional and psychological injuries as a result of the defendants' negligent maintenance.

579. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant officers' actions.

580. Plaintiffs have exhausted the presentment requirements of the FTCA.

### Count 19: Assault
**(by Messrs. Fall, Galindo, Shigla, Armijos, Guallán Tixi, Lucas, Wafula, Lewis, Menjivar Rojas, Pillco Morocho, Prado, and Battistotti against Defendant United States)**

581. The foregoing allegations are re-alleged and incorporated herein by reference.

582. Under Massachusetts law, the elements of assault are: (1) the defendant acts intending to cause a harmful or offensive contact with another, or an imminent apprehension of such a contact; and (2) apprehension is created and experienced by the other person. *Commonwealth v. Henson*, 259 N.E.2d 769, 773–74 (Mass. 1970).

583. Listed Plaintiffs were unjustifiably and unreasonably beaten, pepper sprayed, shot and otherwise attacked by individual Doe officers as described above during the May 1, 2020, attack.

584. The Defendants assaulted listed Plaintiffs when they intentionally acted in a way that created an apprehension of immediate harm during these physical beatings.

585. As a result of the overt acts of individual officers and Sheriff Hodgson, Plaintiffs suffered the described extensive physical and emotional injuries, as well as humiliation.

586. The individual officers and Sheriff Hodgson committed these acts as employees of the United States while acting in the scope of their employment: they acted within the scope of the general authority granted to them, in furtherance of their employer's business, and for the accomplishment of the objectives for which they were hired.

587. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant officers' actions.

588. All listed plaintiffs have met the presentment requirements imposed by the FTCA.

### Count 20: Battery
**(by Messrs. Fall, Galindo, Shigla, Armijos, Guallán Tixi, Lucas, Wafula, Lewis, Menjivar Rojas, Pillco Morocho, Prado, and Battistotti against Defendant United States)**

589. The foregoing allegations are re-alleged and incorporated herein by reference.Under Massachusetts law, the elements of battery are: (1) the defendant acts intending tocause a harmful or offensive contact with another; and (2) the harmful or offensive contactwith another person directly or indirectly results. *Waters v. Blackshear*, 591 N.E.2d 184, 185 (Mass. 1992).

590. Plaintiffs were subjected to multiple unjustifiable and unreasonable beatings, pepper spraying, and other attacks during the May 1, 2020 attack, as described above.

591. Sheriff Hodgson and individual officers committed batteries against the listed plaintiffs when they intentionally caused harm to them in their use of violence which included punching him, kicking, pepper spray, rubber bullets, attack dogs, and excessively tight restraints.

592. As a result of the defendants' multiple batteries, Plaintiffs suffered from extensive physical and emotional injuries, as well as humiliation as described in the complaint.

593. Sheriff Hodgson and individual officers committed these acts as employees of the United States while acting in the scope of their employment: they acted within the scope of the general authority granted to them, in furtherance of their employer's business, and for the accomplishment of the objectives for which they were hired.

594. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant officers' actions.

595. All listed plaintiffs have met the presentment requirements imposed by the FTCA.

### Count 21: Negligent Medical Care
### (by All Plaintiffs against Defendant United States)

596. The foregoing allegations are re-alleged and incorporated herein by reference.

597. Under Massachusetts law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. *Bennett v. Eagle Brook Country Store*, 557 N.E.2d 1166, 1168 (Mass. 1990).

598. Defendants United States of America, DHS, ICE, and individual medical officers owed all Plaintiffs a duty of care. There was a special relationship between Defendants and Plaintiffs since the Defendants reasonably could foresee that they were required to take affirmative action to protect Plaintiffs and could anticipate harm to Plaintiffs from failure to do so. *See Irwin v. Town of Ware*, 467 N.E.2d 1292, 1300 (Mass. 1984).

599. Defendants are solely responsible for the custody and medical care of individuals detained in BCHOC where detainees have no other means of obtaining medical care. Therefore, it was reasonably foreseeable that they would be expected to take affirmative

steps to protect detainees from a deadly virus as well as provide detainees with proper care after injuries resulting from the assault by officers.

600. Defendants United States of America, DHS, and ICE published clearly established standards for individual officers to follow for providing medical care. Defendants did not follow this internal guidance with regards to Plaintiffs. *See* Immigration Customs Enforcement, Performance-Based National Detention Standards on Medical Care (Dec. 2016) (Rule 4.3, 4.5, and 4.8)

601. Defendants breached that duty because they actively disregarded medical directions to safeguard against COVID-19, including directions by the Court, leaving Plaintiffs at risk of contracting the deadly virus.

602. Individual medical officers committed these acts as employees of the United States while acting in the scope of their employment: they acted within the scope of the general authority granted to them, in furtherance of their employer's business, and for the accomplishment of the objectives for which they were hired.

603. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual Defendant officers' actions.

604. Plaintiffs have met the presentment requirements under the FTCA for this claim.


**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter a judgment against Defendants and award the following relief:

1. Award compensatory and punitive damages pursuant to Plaintiffs *Bivens* claims, claims under 42 U.S.C § 1983, respective Plaintiffs' claims under the ADA, the Rehab Act and the Federal Tort Claims Act in an amount to be proven at trial.

2. Costs and reasonable attorneys' fees and litigation costs to Plaintiffs' attorneys.

3. Grant any and all further relief that the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs respectfully request a jury trial.

April 29, 2022

Respectfully submitted
Plaintiffs, by their attorneys,

s/ Oren Nimni
Oren Nimni (BBO# 69182)
Amaris Montes *pro hac vice forthcoming*
*Counsel for Plaintiffs*
Rights Behind Bars
416 Florida Avenue #26152
Washington, D.C. 20001
oren@rightsbehindbars.org
(202) 540-0029