# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

Mario Pillco Morocho et al. )
             Plaintiffs )
              )
             v. )             Civil Action No.: 1:22-10652-WGY
              )
Bristol County Sheriff's Office et al. )
             Defendants. )

## PLAINITFFS' OPPOSITION TO DEFENDANTS' (BRISTOL COUNTY SHERIFF'S OFFICE, THOMAS HODGSON, AND STEVEN SOUZA) MOTION TO DISMISS

Defendants Bristol County Sheriff's Office ("BCSO"), Sheriff Thomas Hodgson ("Hodgson") and Superintendent Steven Souza move to dismiss portions of the above captioned complaint under Fed. R. Civ. P. 12(b)(6). For the reasons stated below their arguments are unavailing and Plaintiffs respectfully request that this Court deny their motion and allow this matter to proceed to discovery.

## LEGAL STANDARD

To overcome a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must only allege sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 546 (2007). Deciding a motion to dismiss under Rule 12(b)(6) is a two-step analysis. *Manning v. Boston Med. Ctr. Cor*p., 725 F.3d 34, 43 (1st Cir. 2013). First, the court must separate the complaint's factual allegations, which must be accepted as true, from its conclusory legal allegations. *Id.* Second, the court must accept the remaining factual allegations as true and decide if, drawing all reasonable inferences in the plaintiffs'

favor, they are sufficient to show an entitlement to relief. *Id.* The court may not disregard factual allegations even if it seems that actual proof of any particular fact is improbable. *Iqbal*, 556 U.S. at 667; *Twombly*, 550 U.S. at 556; *Vanderburgh House, LLC v. City of Worcester*, 530 F. Supp. 3d 145, 151–52 (D. Mass. 2021). A motion to dismiss must focus not on whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claims. *Mitchell v. Mass. Dep't of Corr.*, 190 F.Supp.2d 204, 208 (D. Mass. 2002).

## I.      There is no dispute as to whether Defendants Hodgson and Souza can be sued in their official capacity for Claim 1.

As Defendants state in their Motion to Dismiss Defendants Hodgson or Souza are only proper Defendants in their individual capacities for Claim 1. ECF No. 4 at 4-5. Plaintiffs agree. Claim 1 should proceed against Defendants in their individual capacities.

## II.      Defendants Sheriff Hodgson and Superintendent Souza are not entitled to qualified immunity for any claims.

Defendants Hodgson and Souza move to dismiss Plaintiffs' §1983 claims by arguing that they are entitled to qualified immunity. Dismissal of Plaintiffs' claims on qualified immunity grounds is inappropriate, particularly at this stage of the litigation.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (1999) (quotation marks omitted). In determining whether an official is entitled to qualified immunity, courts engage in a two-pronged inquiry. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* The second prong asks whether the right was "clearly established" at the time of the defendant's conduct. *Id.* The rights must be described with

adequate specificity, but there need not be a case directly on point so long as existing precedent is sufficiently analogous as to place the officers on notice that their conduct was unlawful. *White v. Pauly,* 580 U.S. 73 (2017).

The First Circuit has recognized that applying the qualified immunity standard at an early stage is a difficult burden for the moving party. *See Morelli v. Webster*, 552 F.3d 12, 18–19 (1st Cir. 2009); *see also Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) ("If the operative complaint 'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,'" then granting qualified immunity on a motion to dismiss is prohibited) (quoting *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992)); *Sayed v. Virginia*, 744 F. App'x 542, 545–46 (10th Cir. 2018) ("Asserting a qualified immunity defense via a Rule 12(b)(6) motion, however, subjects the defendant to a more challenging standard of review than would apply on summary judgment"); *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018)("Because a qualified immunity defense so closely depends on the facts of the case, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.").

Defendants cannot meet this heavy burden to show they are entitled to qualified immunity at this stage. Defendants argue that Defendant Hodgson and Defendant Souza are entitled to qualified immunity for Claims 1 and 2 related to their deliberate indifference to the substantial risk of harm of COVID-19. Defendants' Motion to Dismiss ECF No. 4 at 6. Defendants rest on the unprecedented nature of COVID-19 to argue that they did not have sufficient notice that their actions were unlawful, yet it has been well established over decades that deliberate indifference to detainees' exposure to a serious, communicable disease amounts to a constitutional violation. Furthermore, this Court and the individual plaintiffs repeatedly notified Defendants that their lack of testing, refusal to release individuals on bail, and disregard for all CDC guidelines in the moment was likely

to violate detainees' constitutional rights, yet the Defendants vehemently disregarded this courts orders and refused to implement additional protections at the height of the COVID-19.

Second, Defendants also argue that Defendant Hodgson is entitled to qualified immunity for Count 16[1] related to his excessive use of force against Plaintiff Battistotti. ECF No. 4. at 7. Defendants' argument fundamentally mischaracterizes the allegations of the complaint. Defendants characterize Hodgson as simply taking the phone out of Battistotti's hands, when the allegations in the complaint state much more than that—Hodgson ran to Battistotti, grabbed him, pushed him against the phone booth, and violently shook him until officers sprayed him in the face and mouth with chemical agents. This kind of unreasonable force on an unthreatening individual has been well-established to violate the constitution, making qualified immunity improper. Further, Defendants attempts to improperly litigate factual disputes should not be countenanced. At the motion to dismiss stage all well pleaded allegations must be read as true and factual disputes should be resolved in front of a fact finder.

### A. Defendants Sheriff Hodgson and Superintendent Souza are not entitled to qualified immunity for their deliberate indifference in exposing plaintiff to COVID-19

Defendants argue that Sheriff Hodgson and Superintendent Souza are entitled to qualified immunity for Counts 1 and 2 for three main reasons: They argue that 1) COVID-19 presented an "unprecedented challenge" to entities who held people in congregate environments which shields them from liability (ECF No. 4 at 6 ); 2) Defendants assert that took some measures to prevent outbreak of COVID-19 making it "impossible for Plaintiffs to show that either Hodgson or Souza would be on notice that their conduct was unlawful" (*Id.*) and claim 3) "there is no good faith

---

[1] A typographical error resulted in two counts listed as Count 16, one discussed here and one concerning violations of the Rehabilitation Act.

allegation that any of the Plaintiffs suffered any harm" (ECF No. 4 at 7). Each of these arguments fail.

Defendants claim that they are entitled to qualified immunity because they took measures to prevent outbreak of COVID-19 and argue it is "impossible for Plaintiffs to show that either Hodgson or Souza 'would be on notice that their conduct was unlawful.'" ECF No. 4 at 7. At the outset, a 12(b)(6) motion is not a proper venue for Defendants to attempt to introduce their own facts – that is for a later stage. What's more there is no reason that minor mitigation efforts would preclude a constitutional violation or support a finding of qualified immunity. Nevertheless, the Plaintiffs have outlined the numerous ways that the Defendants were deliberately indifferent to an unreasonable risk of contracting COVID-19, in violation of their constitutional rights. The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. V. Liberty interests are implicated when a pretrial detainee claims "he has been subjected to unconstitutional conditions of confinement." *Surprenant v. Rivas*, 424 F.3d 5, 18 (1st Cir. 2005). A detainee or prisoner may state a constitutional violation by alleging that prison officials have, with deliberate indifference, exposed him to a serious, communicable disease that poses an unreasonable risk of serious damage to the prisoner's future health. *See Helling v. McKinney*, 509 U.S. 25, 33–35 (1993); *See also Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011) ("The due process guarantee of the Constitution obliges the government "to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health)(citations omitted).

There is no dispute that COVID-19 was and is a serious, communicable disease that posed an unreasonable risk of harm, including death to detainees at BCHOC. Plaintiffs' Complaint ("Comp.") ¶88-95. Furthermore, many named Plaintiffs have additional disabilities or medical conditions such

as kidney problems, asthma, and tuberculosis that exposed them to further risk of harm of death or serious illness. Comp. ¶ 124-134. Despite the potential risk of death and permanent injury, Defendants were deliberately indifferent to the potential harm to Plaintiffs throughout the height of COVID-19. Plaintiffs allege that Defendants ignored basic commonly-known methods of preventing the disease at the time, including failing to provide adequate cleaning and hygiene supplies, refusing to socially distance, and ignoring any current CDC guidelines for protecting people with COVID-19. Comp. ¶ 96-106.

Defendants argue that it would be "impossible" for Defendants to be on notice that their conduct violated the constitution but it is unfathomable that this Courts holding in *Savino* did not provide adequate notice to the Defendants about their unlawful behavior. Even if Defendants implemented some mitigation efforts, this court in *Savino* explicitly found that officers likely acted with deliberate indifference to the serious harm to detainees because of "three cavernous holes" their mitigation program, the blanket refusal to release detainees, the lack of testing, and lack of contract tracing. *Savino v. Souza*, 459 F. Supp. 3d 317, 329 (D. Mass. 2020). In the order, the Court also noted that ICE had "obstinately refused" to voluntarily protect the immigrants held at BCHOC. *Id.* Even if Defendants were not on notice before the Court order, they were certainly on notice after. Even when the Court ordered release of certain individuals to help implement social distancing, the Defendants continuously refused. Savino v. Souza, No. CV 20-10617-WGY, 2020 WL 3529664, at *3 (D. Mass. June 18, 2020). When the Court ordered Defendants to implement testing, again, virtually no one was tested. *Id.* at *4.

Not only did the Court itself put the Defendants on notice of their unlawful behavior, but Plaintiffs protested and directly wrote to Defendants about their need for protective equipment and cleaning supplies in letters. Comp. ¶102-103. This included a letter drafted by Plaintiffs in March

2020, which was directly addressed to Defendant Hodgson and listed their safety concerns with COVID-19. *Id.* In response to the letter, Hodgson recognized the letter and stated he was aware of their advocacy efforts because he intercepted the letters he sent to detainees. Comp. ¶ 105. Instead of addressing their concerns, he threatened, "Next time things will get ugly." Comp. ¶ 106. Despite the notice by this Court and Plaintiffs', Defendants did not implement safeguards to protect detainees from COVID-19. What's more, Defendants still utilized chemical agents in their May 1,2020 attack at the height of COVID-19, exposing all detainees, especially those with medical conditions or disabilities, to additional exposure to COVID-19 when it caused all the detainees to cough, cry, and be unable to implement social distancing guidelines in the attack. *E.g.* Comp. ¶168-194. Defendants' argument that Plaintiffs have not pleaded harm as a result of their detention during COVID-19 also ignores the many pages outlining current and continuing harm faced by the Plaintiffs which include deteriorating health and serious mental health effects such as depression and anxiety. Comp. ¶ 428-533.

Defendants were also on notice of their violations because Plaintiffs' rights under the Fifth amendment were clearly established at the time of Defendants' conduct. Existing precedent at the time clearly established the right of an individual in custody to protection from heightened exposure to a serious communicable disease. This was first established by the Supreme Court in *Hutto v. Finney*, 437 U.S. 678, 682-83 (1978), when the Court affirmed a finding of an Eighth Amendment violation when officers housed individuals in crowded cells with others suffering from infectious diseases, such as Hepatitis and venereal disease. Later, the Supreme Court in *Helling v. McKinney*, made it explicitly clear that prison officials are not permitted to "be deliberately indifferent to the exposure of inmates to a serious, communicable disease," under the constitution. 509 U.S. 25, 33 (1993). *See also cf.* Farmer v. Brennan, 511 U.S. 825, 843 (1994) ("The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a

sufficiently substantial 'risk of serious damage to his future health[.]'" (quoting *Helling*, 509 U.S. at 35)). Courts across the country have repeatedly applied this reasoning in similar claims creating the "robust consensus" the would properly put Defendants on notice. *See e.g. Andrews v. Cervantes*, 493 F.3d 1047, 1050 (9th Cir. 2007) (recognizing a cause of action under the Eighth Amendment and 42 U.S.C. § 1983 for an alleged policy of not screening inmates for infectious diseases—HIV, Hepatitis C, and Heliobacter pylori—and for housing contagious and healthy individuals together during a known "epidemic of hepatitis C"); *DeGidio v. Pung*, 920 F.2d 525, 528-30 (8th Cir. 1990) (finding an Eighth Amendment violation for failure to protect individuals in custody from the spread of tuberculosis after previously denying injunctive relief); *Loftin v. Dalessandri*, 3 F. App'x 658, 663 (10th Cir. 2001) (recognizing an Eighth Amendment claim for knowingly housing the defendant in a cell with individuals who had tested positive for tuberculosis); Myrick v. State of New Hampshire, No. 05-CV-450-JD, 2006 WL 1424331, at *3 (D.N.H. May 18, 2006) (allowing a prisoner's claim alleging Eighth Amendment violations to proceed because there were facts to show the prison exposed him to a communicable disease, Hepatitis B); Trevizo v. Webster, No. CV 17-5868-MWF (KS), 2018 WL 5917858, at *4, 2018 U.S. Dist. LEXIS 227476, at *11 (C.D. Cal. Sept. 6, 2018) ("It is well accepted that such 'substantial risks of harm' include 'exposure of inmates to a serious, communicable disease[,]'" including MRSA) (citing *Helling*, 509 U.S. at 33).

Given this precedent, it was clearly established both by the Supreme Court and by a robust consensus of lower courts that Defendants were prohibited from acting with deliberate indifference to the serious risk of harm of exposure to the highly communicable and deadly disease of COVID-19. To the extent that Defendants rely on the fact that COVID-19 was unprecedented, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Furthermore, it is not required to differentiate disease by disease to establish that the right was clearly established for purposes of qualified immunity. *See*

*Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017) ("For purposes of qualified immunity, that legal duty need not be litigated and then established disease by disease or injury by injury.")

Others have made the same arguments Defendants now make about COVID-19 and have failed with courts repeatedly denying qualified immunity in cases specifically litigating exposure to COVID-19, finding the law was clearly established despite the novelty of the disease. *See Jones v. Burt*, No. 1:21-CV-41, 2022 WL 3210073, at *1–2 (W.D. Mich. Aug. 9, 2022)(denying qualified immunity in a case brought against prison officials for failing to isolate people known to have COVID-19); *Hampton v. California*, No. 21-CV-03058-LB, 2022 WL 838122, at *8–10 (N.D. Cal. Mar. 20, 2022)( denying qualified immunity at the motion to dismiss stage for an Eighth Amendment claim brought by prisoners for their exposure to COVID-19 because the case law was clearly established that prison officials must protect individuals from communicable diseases, there was no dispute as to the potential risk of COVID-19, and there were facts alleged that the officers did not take the necessary cautions to protect people in the prison); *Jones v. Pollard*, No. 21-CV-162-MMA (RBM), 2022 WL 706926, at *10 (S.D. Cal. Mar. 9, 2022)(same); *Maney v. Brown*, No. 6:20-cv-00570-SB, 2020 WL 7364977 at *6, 2020 U.S. Dist. LEXIS 235447 at *17 (D. Or. Dec. 15, 2020) ("[T]he law is clearly established that individuals in government custody have a constitutional right to be protected against a heightened exposure to serious, easily communicable diseases, and the Court finds that this clearly established right extends to protection from COVID-19."); *Polanco v. California*, No. 21-CV-06516-CRB, 2022 WL 625076, at *13 (N.D. Cal. Mar. 3, 2022) (denying qualified immunity to prison officials on a due-process claim for failure to protect a prison employee from COVID-19 and collecting cases that gave the defendants "fair warning" that it violates the Constitution); *Maney v. Brown*, No. 6:20-CV-00570-SB, 2020 WL 7364977, at *4–6 (D. Or. Dec. 15, 2020) (denying qualified immunity in a case brought by detainees alleging Eighth Amendment violations for prison officials'

deliberate indifference during COVID-19, even though the plaintiff's previous preliminary injunction was denied).

At every stage, Defendants knew of the risk of exposure to COVID-19 in their facility and were deliberately indifferent to this potential harm and the law is clearly established that individuals in government custody have a constitutional right to be protected against a heightened exposure to serious, easily communicable diseases including COVID-19. At this stage there is no substantive foundation for granting Defendants qualified immunity and their motion to dismiss on that ground should be denied.

### B. Defendants Sheriff Hodgson is not entitled to qualified immunity for their use of excessive force against Plaintiff Battistotti.

Defendants argue that Defendant Hodgson is entitled to qualified immunity in Count 16 regarding the allegations of his use of excessive force against Mario Battistotti on May 1, 2020. Defendants frame Sherriff Hodgson's actions as simply "making Battistotti put down the phone when the detainee refused to do so and be tested." ECF No. 4 at 8. They argue that "taking a phone away from a misbehaving detainee cannot, as a matter of law be deemed 'unconstitutional conduct.'" *Id.* But it is Plaintiffs' allegations, not Defendants' baseless assertions, that are of import at the motion to dismiss stage. Plaintiff Battistotti does not contend that Hodgson simply tried to get him to put down the phone. Battistotti pleads that the Sheriff used excessive force when he grabbed him, slammed him against the phone booth, uncontrollably shook him, and allowed other officers to spray him in the face and mouth when there was no security threat nor any active resistance from Battistotti. Comp. ¶ 288-290. These allegations are sufficient to deny qualified immunity for Hodgson on this claim at this stage.

The Fourteenth Amendment protects pretrial and civil detainees from the use of excessive force. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). "[M]ost importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically." *Id.* (internal quotes omitted). Under the Fourteenth Amendment, "the appropriate standard for pretrial detainee's excessive force claim is solely an objective one" and a pretrial detainee must only make a showing that the force purposefully or knowingly used against him was objectively unreasonable. *Id.* at 396. Thus, civil detainees, who have not been convicted of any crimes, "retain *at least* those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Here, Plaintiffs were individuals detained by immigration at all relevant times and are considered civil detainees under the Fourteenth Amendment.

Here, the allegations state that Defendant Hodgson's attack on Battistotti was unnecessary and malicious in nature, and thusly, unreasonable. Immediately prior to Defendant Hodgson's use of force, Hodgson made a number of threats to detainees in the unit by saying, "You're going to be tested and if not [willingly], you will be dragged." Comp. ¶ 157. Hodgson directed his hostility at Battistotti—a known leader in the advocacy efforts to obtain better conditions related to COVID-19—by pointing at him and calling him as a "troublemaker." Comp. ¶287. Plaintiff Battistotti, who was fearful of escalation, did not threaten Defendant Hodgson in any way and simply walked over to the telephone to contact his lawyer in an attempt to quell the situation non-violently. Comp. ¶160, ¶ 288. When Defendant Hodgson saw Battistotti on the phone he ran towards Battistotti, grabbed his arm with the phone, and shoved Mr. Battistotti against the phone booth. Comp. ¶162, ¶ 289. The phone fell out of his hands and Battistotti yelled, "What are you doing? Are you crazy? Help! You're assaulting me!" Comp. ¶ 163. Defendant Hodgson continued to violently shake Mr. Battistotti. Comp. ¶ 289.The altercation continued after a group of officers joined Defendant Hodgson, and

when Battistotti was able to turn away from the Sherriff, he was pepper sprayed in his face and mouth by another officer. Comp. ¶165, ¶290.

Defendants argue that "prison officials have not only the right but also the obligation to use reasonable force to compel prisoners to comply with lawful orders." ECF No.4 at 8. But this assumes the question. Plaintiff alleges that Hodgson used *unreasonable* and *excessive* use of force, not reasonable force. The level of force that Hodgson used—grabbing Battistotti, slamming him against the phone booth, and violently shaking him—clearly exceeds the level of threat or severity of the security concern at issue. In fact, there was no use of force required at all. Here, Battistotti was not verbally or physically threatening Hodgson or any of the other officers, attempting to destroy property, or attempting escape. There was no ongoing prison disturbance like a riot, fight, or verbal altercation. Battistotti simply walked over to make a phone call to his attorney and posed no imminent threat of bodily harm to any of the officers or detainees. Given Defendant Hodgson's threats and identification of Battistotti as a "troublemaker," and because Hodgson attacked Battistotti without any provocation, there are sufficient facts plead to allege an excessive force claim. *Hudson v. McMillian*, 503 U.S. 1, 4–5 (1992) (holding that respondents' use of force was malicious and sadistic because no force was required).

Even assuming Defendants' argument that some use of force was necessary to force a detainee to comply with orders in the abstract, the level of force would still be unreasonable in the situation. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010)(finding excessive force when the plaintiff was hit and body slammed without provocation); *Schultz v. Doher*, 335 F. Supp. 3d 177, 185–86 (D. Mass. 2018)(denying summary judgement because a reasonable juror crediting the plaintiff's version of events could conclude that the officers "applied more force than was necessary to bring about his removal, and that such use of [force] on a defenseless and non-resistant inmate was non de minimis

force applied maliciously and sadistically for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline). Furthermore, Defendant Hodgson allowed the other officers to spray Mr. Battistotti with chemical agents and use additional excessive force which, on its own, attaches cause liability. *See Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986) ("if [an officer], whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983"). But, of course, Hodgson's arguments rely on proffers of fact that are not present in the Complaint and as such not appropriate areas of contention for a motion to dismiss. It may very well be that Hodgson can put forth facts to contest Plaintiffs' claims at trial, but this is a motion to dismiss and not the forum for such fact disputes.

Furthermore, the Defendants argue that "it is inconceivable" that Hodgson would be on notice that his conduct was unlawful in any way. Yet, the Supreme Court has made clear that officers may not expose inmates to gratuitous force divorced from any legitimate penological purpose. *See Wilkins*, 559 U.S. at 37; *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). That precedent alone provided officers with notice that the treatment of Battistotti was unlawful. Additionally, sister Circuits have created a robust consensus by denying qualified immunity in similar situations as this one. *See e.g. Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 196–97 (3d Cir. 2021)(denying qualified immunity because it was "beyond debate" that the plaintiff was not posing a threat when he was simply standing with his hands behind his back after a fight had ended meaning there was no penological purpose for the officers' use of force); *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) ("We have little difficulty concluding that in 2009, the time of the incident, it was well-established, in sufficiently similar situations, that officers may not 'use gratuitous force against a prisoner who has already been subdued ... [or] incapacitated.'" (alteration in original) (quoting *Skrtich*, 280 F.3d at 1303)); *Dobbins v. Giles*, 451 F. App'x 849, 851 (11th Cir. 2012)(denying qualified

immunity because the plaintiff pleaded sufficient facts that there was no need for force when an officer struck him because the plaintiff did not comply with orders to get up); *Covington v. Fairman*, 123 F. App'x 738, 741 (9th Cir. 2004)("In September 1998, it was clearly established that inmates were protected from wanton beatings that exceeded correctional officers' good-faith efforts to address a violation of prison rules"); *Estate of Davis v. Delo*, 115 F.3d 1388, 1394–95 (8th Cir. 1997) ("We agree that the law was well established that striking an unresisting inmate ... in the head while four other officers were restraining his limbs... is a violation of the Eighth Amendment.").

Even assuming Defendants inappropriate arguments and factual assertions that Battistotti was refusing orders, it is well established that officers cannot use unreasonable force even when detainees do not comply with orders. The specific conduct here—grabbing, slamming, and spraying a detainee who was nonthreatening or already was subdued—was clearly unlawful under the precedent of this Court. *See Schultz v. Doher*, 335 F. Supp. 3d 177, 185–86 (D. Mass. 2018)(denying summary judgement because a reasonable juror crediting the plaintiff's version of events could conclude that the officers applied more force than was necessary to bring about his removal on a defenseless and non-resistant); *Schultz v. Houle*, No. 16-CV-11774-PBS, 2018 WL 1188753, at *4–5 (D. Mass. Mar. 5, 2018) (allowing an excessive force case to proceed past summary judgement even though the court found that there were security issues presented when the plaintiff refused to leave the cell because the level of force could be seen as excessive given the context); *Smitherman v. Stevenson*, No. CV 13-10161-PBS, 2017 WL 2981223, at *7 (D. Mass. July 12, 2017) (denying qualified immunity in a claim alleging Defendant prison officials attacked him for no reason because "his right to be free from this alleged use of excessive force was clearly established a the time [and] qualified immunity defense at the pleading stage of the litigation is precluded."); *Tibbs v. Samuels*, No. CV 13-11095-DJC, 2017 WL 1164484, at *7–8 (D. Mass. Mar. 28, 2017) (finding that the plaintiff provided sufficient evidence to provide a dispute of fact that the defendant officers used excessive

force against the plaintiff because "[i]f no incident whatsoever preceded [defendants'] attack on [the plaintiff] (i.e., that [plaintiff's] conduct was not posing a danger to the officers' security)—as [plaintiff] claims—then any physical attack to which he was subjected would, by its very nature, be excessive.")

Thus, a grant of qualified immunity is improper because there is a dispute of material fact that Defendant Hodgson's use of force was unreasonable, and that it was clearly established that his actions were unlawful at the time of the attack.

### III.     Claims related to COVID-19 against Bristol County Sheriff's Office and Defendants Hodgson and Souza are not barred by res judicata.

Here Defendants assert that Claims 1, 16 (Rehab Act), and 17 are precluded and barred by *res judicata*. These arguments lack merit and their motion to dismiss should be denied.

The Supreme Court has articulated that *res judicata* attached where a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were raised in that action. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Generally, a court-approved settlement receives the same res judicata effect as a litigated judgment. *Arrieta–Gimenez v. Arrieta–Negron*, 859 F.2d 1033, 1041 (1st Cir.1988).

Defendants argue Counts 1, 16 and 17 should be dismissed as res judicata because they involve claims "arising out of potential exposure to COVID-19 while detained" which were raised in the *Savino* case. This argument is incorrect for a number of reasons.

First, the Supreme Court has held that class action judgements bars class members from bringing other class actions against Defendants but is not dispositive of individual claims, because "[t]o deny such permission would be tantamount to requiring that every class member be permitted

to intervene to litigate the merits of his individual claim." *Cooper v. Fed. Rsrv.* Bank of Richmond, 467 U.S. 867, 867–68 (1984). In *Cooper*, the Court decided whether individual claims brought by class members were barred by a previous class action suit of employment discrimination resulting in an adverse decision against the plaintiffs. *Id.* at 876-877. The Court explained that "there is a wide gap between (a) an individual's claim [of discrimination] …, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims." *Id.*

The First Circuit in *Cameron v. Tomes* has followed the reasoning in *Cooper* to retain individual claims by individuals involved in class action suits. 990 F.2d 14 (1st Cir. 1993). There, an individual plaintiff filed a conditions of confinement claim in a treatment center but the state argued that his claims were barred by *res judicata* because the plaintiff was included in a class action concerning the right to treatment for all persons confined in the same treatment center. *Id.* at 17. In denying the state's argument of *res judicata*, the First Circuit explained that in *Cooper*, "the Supreme Court confirmed what common sense would suggest: a class action judgment—there, in a discrimination case—binds the class members as to matters actually litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action." *Id.* at 17–18. The Court found that the previous class action suit was concerned with "general issues" such as the physical condition of the center, the treatment of patients generally, and certain policies around double bunking and did not address individual plaintiffs' experience in the facility or particular harms faced by each plaintiff. *Id.* at 17. The plaintiff's individual claims, on the other hand, rested on the plaintiff's individual disability and whether he was provided accommodations or care specific to his individual needs which were not litigated in the previous case. *Id.* at 18. The Court denied the state's argument that the claim was precluded because "class action institutional litigation often addresses

general circumstances, not the distinctive plight of someone claiming special needs or status." *Id.* at 18.

Similarly, here, the litigation and ultimate settlement in the *Savino* class action related to the general condition of the BCHOC during COVID-19, and sought solely injunctive and declaratory relief, it did not address any of the individual plaintiffs' particular experience or harms from being detained during COVID-19. Complaint, *Savino v. Souza*, No. 1:20-cv-10617 WGY. Here, Plaintiffs' individual claims address their individual treatment at BCHOC during COVID-19, including how their particular risk of harm was affected by the Defendants' deliberate indifference during COVID-19. It also requires an individualized assessment into whether and to what extent Defendants provided reasonable accommodations for each plaintiff with a disability during COVID-19.

Additionally, when the prior action is a class action, the party seeking preclusive effect must show that precluding the subsequent action would not violate due process because the class members received adequate notice and representation in the prior action. *See Frank v. United Airlines, Inc.*, 216 F.3d 845, 853 (9th Cir. 2000). For a federal class action certified under Rule 23 of the Federal Rules of Civil Procedure, as here, the court treats preclusive effect differently depending on which subsection of Rule 23 the class action is certified under. The subsections relevant here are (b)(2), where the class seeks injunctive or declaratory relief, and (b)(3), where the class seeks monetary damages. The class notice determines whether a subsection (b)(2) "injunction" class action precludes subsequent damages claims: "Rule 23 ... requires a higher standard of notice for ... (b)(3) [damages] class action, under which individual notice must be provided to 'all members who can be identified through reasonable effort' [and because] all potential members in a ... (b)(3) [damages] class must be allowed to opt out of the class." *Id.* at 851 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974)). Notice in an earlier injunction suit is not sufficient to preclude monetary claims in

later suits. *Id.* As a result, "a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage claims by class members, even if based on the same events." *See Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996).

Here, the *Savino* class was certified as a class under Rule 23(b)(2) for injunctive relief, as the class did not seek to be certified under 23(b)(3) to seek damages. Therefore, this present action which only seeks damages, is not precluded. *See Minnick v. City of Vacaville*, No. 216CV00397KJMCKD, 2017 WL 4340263, at *3–4 (E.D. Cal. Sept. 29, 2017)(finding that an individual could seek individual damages claims for ADA violations even though the plaintiff was a named class member in a class action challenging the same sidewalk conditions because the class sough injunctive relief whereas he sought monetary damages against the city in his individual claim)

Further, the *Savino* case did not include facts related to COVID-19 which occurred after the *Savino* complaint was filed. This includes facts about the attack on May 1, 2020, which caused further risk of contracting COVID-19 when Defendants sprayed detainees with chemical agents, causing them to cough on one another in congregate settings. The aftermath of the attack also made it nearly impossible for individuals to practice social distancing because a unit of the facility was shuttered and because of the forms of punishment Defendants exacted on Plaintiffs. Additionally, allowing Defendants' *res judicata* argument to prevail here would undermine the specific text of the *Savino* settlement agreement which stated "Aside from the habeas and Rehabilitation Act claims expressly alleged in the Complaint, no Class Member waives, dismisses, or releases any claim arising out of their detention, including without limitation claims under the Massachusetts Tort Claims Act, the Federal Tort Claims Act, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 USC § 1983." Settlement Agreement, *Savino v. Souza*, No. 1:20-cv-10617 WGY, at 12. It would also undermine the settlement agreement because the parties to the settlement

agreement stipulated that class members should only consist of "the following individuals and *no others*" (emphasis added) which did not include a number of the plaintiffs in this case including Plaintiffs Fall, Guillermo, Galindo, Illicachi Shigla, Armijos, Menjivar Rojas, Pillco Morocho, Gomes, Andrade Prado Junior, and Battistotti. *Id.* at 3-5. *See In re W. States Wholesale Nat. Gas Antitrust* Litig., 743 F. App'x 802, 803–04 (9th Cir. 2018)("A settlement can limit the scope of the preclusive effect of a dismissal with prejudice by its terms")(internal quotations omitted). For these reasons no claim is barred by *res judicata*.

## IV.     Nothing in the *Savino v. Souza* settlement agreement bars the instant claims.

Defendants assert that Claims 16 and 17 against the Bristol County Sheriff's Office under the Rehabilitation Act and Americans with Disabilities Act respectively should be dismissed because these claims are barred by the court-approved settlement agreement in *Savino v. Souza*. This is incorrect and misreads the relevant agreement. The agreement states in relevant part:

> "In consideration of the representations, promises, and agreements set forth herein, the sufficiency of which is hereby acknowledged, Plaintiffs hereby release and forever discharge Defendant and ICE, from the habeas and Rehabilitation Act claims expressly alleged in the Complaint.
>
> Aside from the habeas and Rehabilitation Act claims expressly alleged in the Complaint, no Class Member waives, dismisses, or releases any claim arising out of their detention, including without limitation claims under the Massachusetts Tort Claims Act, the Federal Tort Claims Act, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 USC § 1983."

Settlement Agreement, *Savino v. Souza*, No. 1:20-cv-10617 WGY at 12. First, as to the parties, Plaintiffs only discharged claims as to the Defendant who was party to the agreement, Steven Souza. Here Defendants now seek to dismiss claims against an entirely different Defendant, the Bristol County Sheriff's Office. BCSO was not a party to the agreement and is not listed in the claims

waiver section. Thus, the waiver against Souza does not bind Plaintiffs from pursuing relief against the BCSO. Second, Plaintiffs expressly *did not* wave claims arising out of their detention that were not addressed in the Complaint in *Savino*. Two such claims are present here. First, there was no claim under the ADA in the *Savino* case and no claim mentioned at any point in the settlement agreement. That claim cannot therefore be barred by the agreement. Next, while Plaintiffs in *Savino* did allege violations of the Rehabilitation Act in their complain and expressly dismiss and discharge those claims, those claims only concerned injunctive relief and declaratory relief and in no way sought to address retrospective harm for Defendant's actions. As such a *damages* action under the Rehabilitation Act was not "expressly alleged in the complaint" and is therefore expressly protected from waiver in the settlement agreement.

## CONCLUSION

For the foregoing reasons Plaintiffs respectfully request that this Court DENY Defendants' Motion to Dismiss in its entirety.

Dated: September 21, 2022

Respectfully submitted
Plaintiffs, by their attorneys,

s/ Oren Nimni
Oren Nimni (BBO# 69182)
Amaris Montes *pro hac vice submitted*
Rights Behind Bars
416 Florida Avenue #26152
Washington, D.C. 20001
oren@rightsbehindbars.org
(202) 540-0029

# CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2022, I caused the forgoing Opposition to Defendants' Motion to Dismiss to be served on parties in this matter via certified mail and by electronically filing through the CM/ECF system for those registered.

September 21, 2022

/s/Oren Nimni

Oren Nimni