UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIO PILLCO MOROCHO, *et al.*,

Plaintiffs,

v.

BRISTOL COUNTY SHERIFF'S OFFICE, *et al.*,

Defendants.

No. 1:22-cv-10652-WGY

**MEMORANDUM IN SUPPORT OF**
**FEDERAL DEFENDANTS' MOTION TO DISMISS**

The Court should dismiss Plaintiffs' complaint against the United States and the U.S. Department of Homeland Security ("DHS") (collectively, the "Federal Defendants"). Plaintiffs assert claims against the Federal Defendants under the Rehabilitation Act and the Federal Tort Claims Act ("FTCA") arising from Plaintiffs' immigration detention during the COVID-19 pandemic in the Bristol County House of Corrections, a facility operated by the Bristol County Sheriff's Office ("BCSO"). But all of these claims fail against the federal government in light of the bedrock doctrine of sovereign immunity.

First, sovereign immunity bars Plaintiffs' claim for money damages under the Rehabilitation Act. Likewise, Plaintiffs' FTCA claims fail because the United States is immune from claims alleging misconduct by an independent contractor, such as BCSO. The Court must construe jurisdiction under the FTCA strictly in the federal government's favor. *Carrol v. United States*, 661 F.3d 87, 94 (1st Cir. 2011). And here, the allegations in the complaint indicate—and the contract between

Immigration and Customs Enforcement ("ICE") and BCSO makes clear—that BCSO was responsible for the safekeeping and medical care of Plaintiffs that underpins their FTCA claims, and that ICE did not closely monitor BCSO's day-to-day activities.

Accordingly, the Court should dismiss all counts in the complaint against the Federal Defendants for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

## I. BACKGROUND

### A. Facts Alleged in the Complaint

ICE, a component of DHS, "retains custody of individuals who are apprehended for immigration purposes and is responsible for the care of these individuals while they are awaiting their immigration proceedings." Compl. & Demand for Jury Trial (Apr. 29, 2022), ECF No. 1, ¶ 23 ("Compl."). ICE entered an intergovernmental services agreement ("IGSA") with BCSO to provide for the detention of immigrants at the Bristol County House of Corrections ("BCHOC"). *Id.* ¶¶ 23-24. "As part of the IGSA, BCSO was required to provide services such as bed space, medical care, facility inspections, [and] transportations," in exchange for a "fixed per-detainee reimbursement rate paid to the facility by ICE." *Id.* ¶ 24. Plaintiffs allege that Defendant Thomas M. Hodgson, the former Sheriff of Bristol County, "maintained supervision and control over" BCHOC. *Id.* ¶ 26. Plaintiffs further allege that Defendant Steven J. Souza "was the superintendent of BCHOC

and was responsible for the safety and security of the detention center, supervised personnel, and managed detention operations." *Id*. ¶ 27.

The 17 Plaintiffs were detained at BCHOC during the COVID-19 pandemic. *Id*. ¶ 3. BCHOC had several housing units, and housed immigration detainees in three of those units (Unit A, Unit B, and Unit 2 East). *Id*. ¶ 34. Some of the Plaintiffs suffered from medical issues that put them at greater risk of harm from COVID-19. Compl. ¶¶ 37, 55, 66, 79, 83, 85, 127, 130, 133.

During the COVID-19 pandemic, BCHOC allegedly suffered from insufficient social distancing, overpopulation, and poor disease-prevention mechanisms, including a lack of testing for COVID-19 and lack of contact tracing. *Id*. ¶¶ 97, 100, 102, 116. "Many guards refused to wear masks and gloves as they interacted with detainees, even for tasks such as distributing medicines and foods." *Id*. ¶ 100. In late March 2022, Plaintiffs protested the "lack of cleaning and hygiene supplies, as well as the lack of social distancing in the overcrowded facility." *Id*. ¶ 102. As of May 7, 2022, "at least eleven officers or other staff, one immigration detainee, and one state detainee" at BCHOC "tested positive for COVID-19[.]" *Id*. ¶ 119. Plaintiffs do not allege, however, that any of them contracted COVID at BCHOC.

Then, on May 1, 2020, BCHOC officers engaged in a physical confrontation with all Plaintiffs housed in Unit B. That day, a "BCSO staff member" tried to move ten detainees from Unit B to a segregated housing unit to test them for COVID-19. *Id*. ¶¶ 136-141. When the detainees refused, "BCHOC staff then notified a series of directors, including Sheriff Hodgson," who came to Unit B to

3

speak to the detainees. *Id*. ¶¶ 146-49, 151-52. Sheriff Hodgson "insisted that the ten detainees" submit to testing, and "threatened that if the detainees did not agree to go to the main building to take the test, they would be taken by force." *Id*. ¶ 154, 156. Shortly thereafter, while still in the presence of Sheriff Hodgson, Plaintiff Marco Battistotti, "went to the phone area and called his lawyer." *Id*. ¶ 160. Sheriff Hodgson "then ran towards Plaintiff Battistotti and physically grabbed his arm in an attempt to get him to hang up the phone." *Id*. ¶ 162. A scuffle ensued, during which a correctional officer "grabbed Plaintiff Battistotti by the neck" and another "corrections officer[] . . . deployed several bursts of chemical agent," injuring several plaintiffs. *Id*. ¶ 165, 167-77. "BCSO staff then released additional gas or chemical agents into the unit." *Id*. ¶ 178. Soon thereafter, "sixteen [Sheriff's Response Team] officers, the BSCO [*sic*] K9 Division, and several other corrections officers, as well as BCSO leadership, including Defendants Hodgson and Souza," entered Unit B and engaged in a physical confrontation with detainees that included physical force, canine attacks, "throwing flash bang grenades," and shooting "pepper-balls" and "what appeared to be rubber bullets," injuring Plaintiffs. ¶¶ 183-300.

Plaintiffs further allege that the Massachusetts Attorney General investigated the May 1, 2020, incident and "concluded that institutional failures at BCHOC and poor decisions by BCSO leadership 'culminated in a calculated—that is planned and deliberate—use of force against'" ICE detainees "'that was disproportionate to the security needs at the time . . . .'" *Id*. ¶ 417. "On May 20, 2021, Homeland Security Secretary Alejandro Mayorkas directed ICE to

discontinue their contract with the Bristol County Sheriff's Office as well as to close the Bristol County Detention Center because of the government's conclusions of mistreatment of detainees during the May 1, 2020, attack." *Id.* ¶ 424.

### B. Procedural History

Plaintiffs filed suit in this Court on April 29, 2022, asserting claims against the United States, DHS, ICE, an individual federal defendant, BCSO, BCHOC, the former Sheriff of Bristol County, the superintendent of BCHOC, and 24 unnamed BCSO officers. *Id.* ¶¶ 21-30. The federal defendants (the United States, DHS, ICE and the individual federal defendant) moved to dismiss for lack of service. Fed. Defs.' Partially-Assented-To Mot. to Dismiss for Lack of Service (Nov. 2, 2022), ECF No. 17. The Court granted the motion to dismiss and permitted Plaintiffs 30 additional days to properly serve each federal defendant, ruling that the case is dismissed without prejudice as to any defendant not served within the 30-day period. Electronic Order (Nov. 17, 2022), ECF No. 21. Plaintiffs failed to serve ICE and the individual federal defendant within the 30-day period, resulting in their dismissal. *See id.*; Electronic Order (Dec. 27, 2022), ECF No. 26 (granting the individual federal defendant's assented-to motion to dismiss for lack of service). Accordingly, the only two remaining federal defendants are the United States and DHS.

In all, Plaintiffs assert 21 claims, but only five are directed at DHS or the United States. Plaintiffs assert a violation of the Rehabilitation Act against DHS

5

(Count 16),¹ and four claims against the United States under the Federal Tort Claims Act ("FTCA") for negligent maintenance (Count 18), assault (Count 19), battery (Count 20), and negligent medical care (Count 21).  Compl. ¶¶ 542-56, 571-604.

## II.    LEGAL STANDARD

"The proper vehicle for challenging a court's subject-matter jurisdiction," including on grounds of sovereign immunity, "is Federal Rule of Civil Procedure 12(b)(1)."  *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001).  Under Rule 12(b)(1), Plaintiffs bear the burden to show that the Court has subject matter jurisdiction over their claims.  *See Reyes-Colón v. United* States, 974 F.3d 56, 60 (1st Cir. 2020).  Where, as here, a motion to dismiss for lack of subject matter jurisdiction "contests factual allegations of the complaint, the court must engage in judicial factfinding to resolve the merits of the jurisdictional claim."  *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021).

In evaluating a Rule 12(b)(1) motion contesting subject matter jurisdiction under the FTCA, the Court's inquiry "is tilted toward the government's claim of immunity: '[T]he FTCA must be construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires.'"  *Carrol*, 661 F.3d at 94 (internal quotations omitted) (quoting *Bolduc*, 402 F.3d 50, 56 (1st Cir. 2005)).

---

¹ The Rehabilitation Act claim against DHS is the second "Count 16" in the complaint, beginning on page 74 of the complaint.

### III. ARGUMENT

#### A. Sovereign Immunity Precludes Plaintiffs' Rehabilitation Act Claim

Plaintiffs' claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, against DHS fails because the United States has not waived its sovereign immunity from private claims seeking monetary damages under the Rehabilitation Act.  Plaintiffs Rehabilitation Act claim alleges that DHS and BCSO's failure to adequately protect certain disabled Plaintiffs from COVID-19 denied those "Plaintiffs access to programs[,] services or activities such as a safe place to sleep."  Compl. ¶¶ 547-52.  Plaintiffs further allege that DHS and BCSO failed to accommodate certain disabled Plaintiffs "during the planned use of force on May 1, 2020," which "put those disabled individuals at a higher risk of harm in contrast to able bodied detainees." *Id.* ¶ 554.  Plaintiffs' Rehabilitation Act claim seeks compensatory and punitive damages, but not injunctive relief.  *Id.* at 83.

Sections 504 and 505 of the Rehabilitation Act (codified, respectively, at 29 U.S.C. §§ 794(a) and 794a), provide in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a) (Section 504).

While Section 504 of the Rehabilitation Act creates a substantive right to non-discrimination on the basis of disability, Section 505 (29 U.S.C. § 794a) addresses remedies for violations of Section 504:

> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) … shall be available to any person aggrieved by any act or failure to act by *any recipient of Federal assistance or Federal provider of such assistance* under section 794 of this title.

29 U.S.C. § 794a(a)(2) (emphasis added).

Thus, while Section 505 of the Rehabilitation Act provides that "the remedies available for violations of Title VI would be similarly available for violations of § 504(a) 'by any recipient of federal assistance or Federal provider of such assistance[,]'" Section 505 "makes no mention whatsoever of 'program[s] or activit[ies] conduct by any Executive agency,' the plainly more far-reaching language Congress employed" in Section 504. *Lane v. Pena*, 518 U.S. 187, 192-93 (1996) (quoting 29 U.S.C. § 794a(a)(2) & 29 U.S.C. § 794(a)). Accordingly, the Supreme Court has held that the "reference to 'Federal provider[]s' of financial assistance in § 505(a)(2) does not, without more, establish that Congress has waived the Federal Government's immunity against monetary damages beyond the narrow category of § 504(a) violations committed by federal funding agencies acting as such—that is, by 'Federal provider[s].'"[2] *Id.* at 193 (29 U.S.C. § 794a(a)(2)).

---

[2] Plaintiffs do not allege that DHS is liable under the Rehabilitation Act as a "federal funding agenc[y] acting as such[.]" *See Lane*, 518 U.S. at 193. Instead, Plaintiffs allege, albeit in a conclusory manner, that DHS directly violated the Rehabilitation Act. *See* Compl. ¶¶ 552-56 (alleging that DHS failed to protect

8

In other words, Congress has "spoken to the question of remedies in § 505(a)(2) . . . and has done so in a way that suggests that it did not in fact intend to waive the Federal Government's sovereign immunity against monetary damages awards for Executive agencies' violations of § 504(a)." *Id.* at 197; *see also Thiersaint v. Dep't of Homeland Sec.*, No. 18-cv-12406-DJC, 2022 WL 220480, at *10 (D. Mass. Jan. 25, 2022) ("The Rehabilitation Act does not waive the United States' sovereign immunity for monetary claims arising from alleged discrimination 'under any program or activity conducted by any Executive agency.'" (quoting *Lane*, 518 U.S. at 197)); *Plater v. United States*, 359 F. Supp. 3d 930, 938 (C.D. Cal. 2018) ("[T]he government has not waived its sovereign immunity against emotional distress damages for the Defendants' alleged violation of Section 504 of the Rehabilitation Act."); *Gray v. United States*, 69 Fed. Cl. 95, 102-03 (2005) (applying *Lane* to dismiss a Section 504 damages claim against the United States).

Accordingly, the Court lacks subject matter jurisdiction over Plaintiffs' claim under the Rehabilitation Act. *See Thiersaint*, 2022 WL 220480, at *10.[3]

### B.  The Independent Contractor Exception Bars Plaintiffs' FTCA Claims

Sovereign immunity likewise bars Plaintiffs' FTCA claims because the independent contractor exception excludes the United States from liability for the acts or omissions of an independent contractor, such as BCSO.

---

Plaintiffs from COVID-19, continued to detain Plaintiffs despite the pandemic, and failed to accommodate certain Plaintiffs during the incident on May 1, 2020).

[3] Plaintiff Lloyd Wafula's Rehabilitation Act claim also fails for the additional reason that it is barred by a previous settlement agreement. *See* Order (Nov. 17, 2022), ECF No. 20 at 2-3.

### 1. The FTCA and the Independent Contractor Exception

The FTCA provides a limited waiver of sovereign immunity allowing suits against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  However, the FTCA "was never intended, and has not been construed by [the Supreme Court], to reach employees or agents of all federally funded programs that confer benefits on people." *United States v. Orleans*, 425 U.S. 807, 813 (1976).  Indeed, the language of the FTCA, 28 U.S.C. § 1346(b), is "unambiguous, covering injuries 'caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment . . . .'" *Id*.  The FTCA defines government employees as including officers and employees of "any federal agency," but specifically excludes "any contractor with the United States." *Id*. at 814. (quoting 28 U.S.C. § 2671).

"A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Id*. (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973) (internal quotations omitted)).  Under the independent contractor exception to the FTCA, "the government may not be held responsible for negligent acts or omissions committed by employees of government contractors whose daily operations are not

10

closely supervised by United States officials – in essence, eliminating vicarious liability as a theory of recovery against the federal government." *Carrol*, 661 F.3d at 92 (citing *Orleans*, 425 U.S. at 815).

### 2. Plaintiffs' FTCA Claims

Plaintiffs' assert the following four FTCA claims against the United States, asserting liability for negligence and intentional torts:

- **Negligent maintenance (Count 18):** Plaintiffs allege that the United States, DHS, and ICE "owed Plaintiffs a duty of care" because they were "solely responsible for the custody and maintenance of the facility where detainees have no other means of control over their living space[.]" Compl. ¶ 573-74. Plaintiffs allege that the United States, DHS, and ICE "breached that duty" by subjecting Plaintiffs to substandard "conditions of confinement during COVID-19" and by not giving Plaintiffs "protection, social distancing, or cleaning supplies[.]" *Id.* ¶ 576.

- **Negligent medical care (Count 21):** Plaintiffs allege that the United States, DHS, and ICE "owed all Plaintiffs a duty of care" because they were "solely responsible for the custody and medical care of individuals detained in BCHOC where detainees have no other means of obtaining medical care." *Id.* ¶¶ 598-99. Plaintiffs claim that the United States, DHS, and ICE "breached that duty because they actively disregarded medical directions to safeguard against COVID-19, including directions by the Court, leaving Plaintiffs at risk of contracting the deadly virus." *Id.* ¶ 601. Plaintiffs assert that "[i]ndividual medical officers committed these acts as employees of the United States while acting in the scope of their employment[.]" *Id.* ¶ 602.

- **Assault (Count 19):** Plaintiffs allege that they were attacked without justification on May 1, 2020, and that the United States assaulted Plaintiffs by "intentionally act[ing] in a way that created an apprehension of immediate harm during these physical beatings." *Id.* ¶¶ 583-84. Plaintiffs claim that the "individual officers and Sheriff Hodgson committed these acts as employees of the United States while acting in the scope of their employment." *Id.* ¶ 586.

- **Battery (Count 20):** Plaintiffs allege that "Sheriff Hodgson and individual officers committed batteries" against Plaintiffs on May 1, 2020, "when they intentionally caused harm to them in their use of violence, which included punching him, kicking, pepper spray, rubber bullets, attack dogs, and

excessively tight restraints." *Id.* ¶¶ 590-91. Plaintiffs claim that "Sheriff Hodgson and individual officers committed these acts as employees of the United States while acting in the scope of their employment[.]" *Id.* ¶ 593.

The substance of these claims falls within a contract between ICE and BCSO, which makes clear that BCSO was an independent contractor within the meaning of the FTCA and BCSO was responsible for the medical care and safekeeping of Plaintiffs.

### 3. The Contract Between ICE and BCSO

BCHOC housed federal immigration detainees pursuant to a contract, known as an IGSA, between ICE and BCSO. Exhibit 1, Inter-Governmental Service Agreement (Sept. 27, 2007) at 2 ("IGSA").[4] The IGSA provided for BCSO's "detention, and care of persons detained under the authority of the Immigration and Nationality Act" in exchange for a "detainee day rate" payment from ICE. *Id.* The IGSA provided that BCSO "shall provide ICE detainees with *safekeeping*, housing, subsistence, *medical* and other services in accordance with this Agreement." *Id.* at 3 (all emphasis added). "In providing these services," BCSO was to "ensure compliance with all applicable laws, regulations, fire and safety codes, policies and procedures." *Id.* More particularly, the IGSA required BCSO to

---

[4] Cited page numbers of the IGSA refer to the ECF-stamped page number at the top of each page of Exhibit 1. The version of the IGSA attached to this memorandum redacts contact information and reimbursement rates for involved personnel. Should the Court prefer that the Federal Defendants file an unredacted version under seal, the Federal Defendants will do so.

12

"house detainees and perform related detention services in accordance with the most current edition of ICE National Detention Standards."[5]  *Id*. at 5.

According to the IGSA, "ICE inspectors will conduct periodic inspections of the facility to assure compliance with ICE National Detention Standards."  *Id*.  The IGSA required BCSO to "allow ICE to conduct inspections of the facility, as required, to ensure an acceptable level of services and acceptable conditions of confinement, as determined by ICE."  *Id*. at 9.  "No notice to [BCSO was] required prior to an inspection."  *Id*.  Following inspection, ICE was entitled to require BCSO to implement "improvements to facility operation, conditions of confinement, and level of service[.]"  *Id*.  If BCSO "fail[ed] to remedy deficient service identified through an ICE inspection, ICE [could] terminate" the IGSA.  *Id*.

As is particularly relevant here, the IGSA took pains to delineate that BCSO was responsible for the medical care of ICE detainees at BCHOC.  The IGSA provided that BCSO "shall provide ICE detainees with on-site health care services under the control of a local government designated Health Authority."  *Id*.; *see also id*. at 5 (providing that BCSO "shall furnish on-site health care under this Agreement").  More specifically, the IGSA required BCSO to:

> ensure that ICE detainees receive no lower level of on-site medical care and services than those it provides to local inmates.  On-site health care services shall include arrival screening within twenty-four (24) hours of arrival at the Facility, sick call coverage, provision of over-the-counter medications, treatment of minor injuries (e.g. lacerations, sprains, and contusions), treatment of special needs and mental health

---

[5] A 2010 amendment to the IGSA identifies the "2010 ICE Performance Based National Detention Standards" as the applicable ICE detention standards.  Ex. 1, IGSA at 35.

assessments. Detainees with chronic conditions shall receive prescribed treatment and follow-up care.

*Id.* at 6. BCSO was further required to "furnish twenty-four (24) hour emergency medical care and emergency evacuation procedures." *Id.* at 7.

Moreover, BCSO was to "ensure equipment, supplies, and materials, as required by the Health Authority, are furnished to deliver health care on-site." *Id.* The IGSA also required BCSO to "ensure that all health care service providers utilized for ICE detainees hold current licenses, certifications, and/or registrations with the State and/or City where they are practicing." *Id.* And BCSO was to "retain a registered nurse to provide health care and sick call coverage unless expressly stated otherwise in" the IGSA.[6] *Id.*

### 4. Application of the Independent Contractor Exception to Plaintiffs' FTCA Claims

The United States is not subject to vicarious liability under the FTCA for the acts or omissions of its independent contractor, BCSO. Plaintiffs do not allege any facts supporting that DHS or ICE had the power to "control the detailed physical performance" of BCSO, which is a "critical element" in determining whether BCSO was an independent contractor. *See Orleans*, 425 U.S. at 814 (quoting *Logue*, 425 U.S. at 814). To the contrary, Plaintiffs allege that, under the IGSA, "*BCSO was required* to provide services such as bed space, medical care, facility inspections,

---

[6] In 2017, ICE also entered into an agreement with BCSO under section 287(g) of the Immigration and Nationality Act by which certain BCSO personnel could "be nominated, trained, and approved by ICE to perform certain functions of an immigration officer within the BCSO's jail/correctional facilities." Memorandum of Agreement (Jan. 18, 2017), https://www.ice.gov/doclib/287gMOA/Bristol_MOA_01182017.pdf, at 1. That agreement has no application here.

14

[and] transportations . . . ." Compl. ¶ 24 (emphasis added).  Consistent with this contractual arrangement, Plaintiffs allege that Sheriff Hodgson "maintained supervision and control" over BCHOC, and that the superintendent of BCHOC "was responsible for the safety and security of the detention center, supervised personnel, and managed detention operations." *Id*. ¶¶ 26-27.  Similarly, the complaint does not allege that any employee of any federal agency was involved in the alleged assault and battery on May 1, 2020 (Counts 19 and 20).  *Id*. ¶¶ 586, 593.

The IGSA only confirms that BCSO was an independent contractor because BCSO, "rather than the government, exercise[d] day-to-day supervision and control of its own activities." *See Carroll*, 661 F.3d at 95.  The IGSA required BCSO to provide medical and safekeeping services to Plaintiffs.  Ex. 1, IGSA at 3.  In keeping Plaintiffs safe and tending to their medical care, the IGSA required BCSO to comply with ICE standards concerning detainee safety and medical care.  *Id*. at 3, 5; *see Orleans*, 425 U.S. at 816 (holding that contractual agreements fixing "specific and precise conditions to implement federal objectives . . . do not convert the acts of entrepreneurs or of state governmental bodies into federal government acts").  But the federal government did not control BCSO's detailed physical performance of maintaining safe conditions, providing medical care, and ensuring the safekeeping of detainees at BCHOC.  *E.g*. Ex. 1, IGSA at 3 (providing that BCSO "shall provide ICE detainees with safekeeping, housing, subsistence, medical and other services").  Nor did the IGSA authorize the federal government to closely supervise BCSO's daily operations; instead, the IGSA provided ICE a right to inspect BCHOC to

15

assess compliance with ICE standards. *Id.* at 5, 9; *see Carroll*, 661 F.3d at 103 n.19 (explaining that the federal government does not "lose its immunity if it retains the right to review a contractor's work").

The Supreme Court's decision in *Logue* confirms BCSO's status as an independent contractor. In *Logue*, the Supreme Court considered whether a county jail housing federal inmates was an independent contractor, focusing on "the absence of the authority in the principal" (there, the federal Bureau of Prisons) "to control the physical conduct of the contractor" (there, a county jail) "in performance of the contract." *Logue*, 412 U.S. at 527. The Supreme Court has described the *Logue* decision as follows:

> In *Logue* this Court held that employees of a county jail that housed federal prisoners pursuant to a contract with the Federal Bureau of Prisons were not federal employees or employees of a federal agency; thus, the United States was not liable for their torts. Although the contract required the county jail to comply with Bureau of Prisons' rules and regulations prescribing standards of treatment, and although the United States reserved rights of inspection to enter the jail to determine its compliance with the contract, the contract did not authorize the United States to physically supervise the jail's employees. In short, it could take action to compel compliance with federal standards, but it did not supervise operations.

*Orleans*, 425 U.S. at 814-15; *see also Logue*, 412 U.S. at 529-30. Similarly here, (1) the IGSA required BCSO to "comply" with federal "rules and regulations prescribing standards of treatment"; (2) ICE "reserved rights of inspection"; and (3) the IGSA "did not authorize the United States to physically supervise [BCSO's] employees." As in *Logue*, this Court must conclude that BCSO is an independent contractor.

16

And because the United States is immune from claims concerning acts or omissions by an independent contractor, the Court must dismiss Plaintiffs' FTCA claims for lack of subject matter jurisdiction. *See Carroll*, 661 F.3d at 93 (agreeing with district court's decision on a motion to dismiss that entities were independent contractors); *Acosta v. U.S. Marshals Serv.*, 445 F.3d 509, 514 (1st Cir. 2006) (holding that the independent contractor exception applies where "the negligent treatment of a federal prisoner is the fault only of a non-federal facility holding the prisoner under contract" (citing *Logue*, 412 U.S. at 530-32)); *Thiersaint*, 2022 WL 220480, at *8 (holding on summary judgment that the independent contractor exception barred FTCA liability related to ICE detention in a county facility in light of an IGSA between ICE and the facility); *Pavlas v. United States*, No. 12-10470-JCB, 2014 WL 12576639, at *3 (D. Mass. Mar. 19, 2014) (dismissing on summary judgment FTCA claims against the United States based on the conduct of an independent contractor's employee where the federal government did not supervise the contractor's employee and, "[a]t most, federal employees retained the right to inspect" the contractor's activities to ensure contractual compliance).[7]

---

[7] Plaintiffs cannot sufficiently allege that the federal government controlled BCSO through a few vague, conclusory allegations lacking factual support. *See* Compl. ¶¶ 96, 99, 102 (faulting ICE, without support, for failing to take appropriate precautions against COVID-19 at BCHOC); ¶ 126 (reflecting the only allegation in the complaint against ICE medical staff); ¶¶ 573-74, 598-99 (alleging, without support, that the federal government was "solely responsible" for maintaining BCHOC and providing medical care to detainees there). For one, the Court need not credit these allegations in resolving a Rule 12(b)(1) motion. *See Cebollero-Bertran*, 4 F.4th at 69. In any event, such allegations conflict with Plaintiffs' own complaint (*see* Compl. ¶¶ 24, 26-27) and the IGSA, each of which shows that ICE did not control the day-to-day activities of BCSO. *See Project Veritas Action Fund v.*

17

## IV. CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint against the United States and DHS in its entirety.

Dated: February 13, 2023

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:  */s/ Julian N. Canzoneri*
JULIAN N. CANZONERI
Assistant U.S. Attorney
U.S. Attorney's Office
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3170
julian.canzoneri@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorneys of record by means of the Court's Electronic Case Filing system on February 13, 2023.

 */s/ Julian N. Canzoneri*
Julian N. Canzoneri
Assistant U.S. Attorney

---

*Conley*, 270 F. Supp. 3d 337, 340 (D. Mass. 2017) ("In resolving a Rule 12(b)(1) motion, we may also consider other materials in the district court record, including where those materials contradict the allegations in the complaint." (quoting *Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16, 17 (1st Cir. 2011))).